AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Keith Ramon Mayfield, et al.<br>(See Attachment for Defendants) | ) <br> ) <br> ) Case No. <br> ) $4-15-70627$ MAG |
| _Defendant(s)_ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 2012 to March 3, 2015 _____ in the county of _____ Alameda _____ in the

_____ Northern _____ District of _____ California _____, the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 21 U.S.C. 846, 841(b)(1)(B)(vii) | Conspiracy to Distribute, and to Possess with Intent to Distribute, 100 or More Kilograms of Marijuana |

Approved as to form:

_[signature]_

AUSA GARTH HIRE

Penalties:
(1) Imprisonment: 40 Years, Mandatory Minimum 5 Years
(2) Fine: Maximum $5,000,000
(3) Supervised Release: Maximum Life, Mandatory Minimum 4 Years
(4) Special Assessment: $100

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT.

☑ Continued on the attached sheet.

_[signature]_
_Complainant's signature_

Richard P. Harvey, FBI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 5/15/15

_[signature]_
_Judge's signature_

City and state: _____ Oakland, California _____

Hon. Kandis A. Westmore, U.S. Magistrate Judge
_Printed name and title_

# ATTACHMENT TO CRIMINAL COMPLAINT

## *UNITED STATES v. KEITH RAMON MAYFIELD, ET AL.*

<u>Defendants</u>

Keith Ramon Mayfield,
Kenneth Wayne Fleming,
Michael Herb Videau,
Donald Ray Holland, II
Brandon Jerrod Davillier,
Major Alexander Session, III,
Clyde Barry Jamerson, Jr.,
Travon Jahmal Franzwa Baker,
Ahshatae Marie Millhouse,
Laticia Ann Morris,
Kameron Kordero Eldridge Davis,
Ronnell Lamar Molton,
Francisco Manuel Carrasco, and
Sophia Cherise West

**AFFIDAVIT**

I, Richard P. Harvey, being duly sworn, declare as follows:

## I.   BACKGROUND AND PURPOSE OF AFFIDAVIT

1.      I am a federal law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since January 2011. I am a graduate of the FBI Academy in Quantico, Virginia. As part of my training to become a Special Agent, I received approximately 21 weeks of instruction at the FBI Academy. Since graduating from the Academy, I have received further training in Federal and California laws and investigative techniques relating to wire, electronic, and physical surveillance; criminal street gangs and criminal enterprises.

2.      As an FBI SA, I have conducted and participated in investigations of narcotics trafficking, organized crime, bank robbery, illicit firearms, and fugitives. During these investigations, I have utilized, or participated in investigations that utilized, various types of investigative techniques, including electronic surveillance pursuant to court-authorized wiretaps; undercover agents and informants; controlled purchases of firearms and narcotics from suspects; physical surveillance, consensual recordings, investigative interviews, mail covers, garbage searches, GPS tracking devices, pole-mounted cameras, and the service of grand jury subpoenas. I have participated in the execution of numerous state and federal arrest warrants and search warrants.

3.      I have interviewed drug dealers, drug users, and knowledgeable confidential informants about lifestyles, appearances, and habits of drug dealers and users. I have become familiar with the manner in which narcotics traffickers manufacture, cultivate, smuggle, package, store, and distribute narcotics, as well as how they launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, intentionally vague language, coded communications and slang-filled conversations, false and fictitious identities, and other means to facilitate their illegal activities and to thwart law enforcement investigations. I have had conversations with other law enforcement personnel about the manufacture, cultivation, preparation, and packaging of narcotics, the distribution methods of illegal narcotics traffickers, and

1

1 the security measures that narcotics traffickers often employ. I have also examined documentation of

2 various methods by which marijuana, methamphetamine, cocaine, and other illicit drugs are

3 smuggled, transported, and distributed. I have participated in surveillance of narcotics traffickers.

4 During these surveillances, I have personally observed narcotics transactions, counter-surveillance

5 techniques, and the ways in which narcotics traffickers conduct clandestine meetings. I have also

6 participated in the court-authorized interception of wire communications and court-authorized search

7 of seized personal electronic devices, to include cellular telephones, personal computers, laptops,

8 personal digital assistants (PDA), tablets, cameras, and other, similar devices which store electronic

9 information and communications. I have been directly involved in the review of, and deciphering of

10 intercepted coded conversations between narcotics traffickers that were later corroborated by

11 surveillance, defendants' statements, or other information developed during my investigation.

12        4.        The facts and opinions set forth in this affidavit are based on my own personal

13 knowledge, knowledge obtained from other individuals during my participation in this investigation,

14 my review of documents, reports, and computer records related to this investigation, communications

15 with others who have personal knowledge of the events and the circumstances described herein,

16 consensually recorded telephone calls, information from Cooperating Witnesses, court-authorized

17 review of seized personal electronic devices, trash searches, mail covers, physical and electronic

18 surveillance (pole-mounted and covert cameras), court-authorized pen registers and trap and trace

19 devices (PRTT), and knowledge gained through my training, experience, and participation in this

20 investigation. Numerous law enforcement agencies, as well as the Port of Oakland, have participated

21 in this investigation including the FBI, Alameda County Sheriff's Office (ACSO), Internal Revenue

22 Service – Criminal Investigation (IRS), Drug Enforcement Administration (DEA), United States

23 Postal Inspection Service (USPIS), and various other federal, state, and local agencies. Throughout

24 this affidavit I use the term "Agents" to refer to one or more members of one or more of the agencies

25 that have participated in this investigation.

26        5.        This affidavit is intended to establish probable cause in support of the requested search

27 and arrest warrants and criminal complaint. Because this affidavit is submitted for the limited

28 purpose of establishing probable cause, it does not set forth each and every fact that I, or others, have

1   learned during the course of the investigation. Retrieved text messages are set forth verbatim but may

2   not constitute all texts sent during any particular exchange. Due the nature of text messaging, there

3   may be variations in spacing, capitalization, and punctuation. My interpretations of text message

4   exchanges are based on my training, experience, and knowledge of the investigation to date but may

5   change as additional information is learned through the course of the investigation. All dates, times,

6   dollar amounts, quantities of narcotics, and numbers of phone contacts set forth below are

7   approximate.

8       6.      I make this affidavit in support of warrants to search locations and vehicles used by

9   members and associates of a drug trafficking organization (DTO). In conducting the affairs of this

10  drug trafficking organization I believe that its members and associates (the TARGET SUBJECTS)

11  have committed, and are committing, the following federal crimes: Manufacture, Possession with

12  Intent to Distribute, and Distribution, of a Controlled Substance (21 U.S.C. § 841(a)(1)); Conspiracy

13  to Manufacture, to Possess with Intent to Distribute, and to Distribute, a Controlled Substance (21

14  U.S.C. § 846); Use of a Telecommunications Facility to Facilitate Narcotics Trafficking (21 U.S.C. §

15  843(b)); Money Laundering and Money Laundering Conspiracy (18 U.S.C. §§ 1956, 1957);

16  Conspiracy to Enter an Airport Area in Violation of Security Requirements (18 U.S.C. § 371);

17  Entering an Airport Area in Violation of Security Requirements (49 U.S.C. § 46314(a)); RICO (18

18  U.S.C. § 1962(c)); RICO Conspiracy (18 U.S.C. § 1962(d)); Interstate Travel in Aid of Racketeering

19  (18 U.S.C. § 1952); and Aiding and Abetting (18 U.S.C. § 2) (collectively, the TARGET

20  OFFENSES). I also make this affidavit in support of a criminal complaint charging Keith Ramon

21  Mayfield (MAYFIELD), Kenneth Wayne Fleming (FLEMING), Michael Herb Videau (VIDEAU),

22  Donald Ray Holland (HOLLAND), Brandon Jerrod Davillier (DAVILLIER), Major Alexander

23  Session, III (SESSION), Clyde Barry Jamerson, Jr. (JAMERSON), Travon Jahmal Franzwa Baker

24  (BAKER), Ahshatae Marie Millhouse (MILLHOUSE), Laticia Ann Morris (MORRIS), Kameron

25  Kordero Eldridge Davis (DAVIS), Ronnell Lamar Molton (MOLTON), Francisco Manuel Carrasco

26  (CARRASCO), and Sophia Cherise West (WEST), with conspiracy to distribute, and possession with

27  intent to distribute, marijuana, in violation of 21 U.S.C. § 846, as well as warrants for their arrest.

28

## II.    SUMMARY OF INVESTIGATION

7.      I am investigating a DTO that is engaged in the transportation and distribution of marijuana throughout the United States by smuggling those narcotics through the Oakland International Airport (the Airport) which is operated by the Port of Oakland (Port).  This is accomplished by baggage handlers employed by Southwest Airlines (Southwest) who circumvent airport security measures and provide marijuana to outbound passengers for distribution in cities throughout the United States.

8.      Specifically, a baggage handler will enter the Air Operations Area (AOA) of the Airport while in possession of backpacks or duffel bags (collectively referred to throughout this affidavit as "baggage") containing marijuana.  The AOA is an area of the Oakland Airport that is accessible to employees but not to passengers who have completed security screening through a Transportation Security Administration (TSA) checkpoint.  The baggage handlers are not required to pass through a TSA security screening checkpoint to enter the AOA through the employee entrance.

9.      The baggage handler then uses his Port-issued security badge to open a security door that separates the AOA from the sterile passenger terminal where outbound passengers, who have already passed through the TSA security and screening checkpoint, wait to board their outbound flights.  The baggage handler enters a small sitting/phone bank area of the passenger terminal in Terminal 2 (Southwest Terminal) of the Airport (the Vestibule) and meets a co-conspirator.  The co-conspirator is an outbound passenger who has a ticket to fly to another city in the United States and who has already passed through a TSA checkpoint.  The baggage handler then gives the baggage containing packages of marijuana to the outbound co-conspirator who then carries this baggage containing marijuana as carry-on luggage on his or her outbound flight.  After arriving in the destination city, the marijuana is further distributed and sold.  On some occasions the marijuana has been shipped via Southwest Cargo (which Southwest employees can use for a discounted rate) from Oakland to other cities in the United States.

10.     The cash proceeds of the marijuana sales are then deposited into the bank accounts of co-conspirators at bank branches in destination cities, including Little Rock, Arkansas.  Then, on the

1   same day or within the next few days, a co-conspirator would withdraw the narcotics trafficking

2   proceeds as cash from their bank accounts at bank branches in Northern California.

3      11.      Given the nature of this particular drug trafficking organization, I believe that physical

4   and electronic records that evidence the TARGET OFFENSES, such as flight records, hotel records,

5   rental car records, telephone records, shipment records, receipts for the purchase of duffel bags and

6   backpacks, financial statements, bank documents, and tax returns will be located within the

7   SUBJECT PREMISES.  This is especially true of electronic devices located inside the SUBJECT

8   PREMISES because many travel-related entities (such as hotels and airlines) now send confirmations,

9   updates, and reminders to customers via e-mail and/or text messaging which can be maintained on a

10  particular device until and unless it is deleted.  Thus, I believe that evidence of the TARGET

11  OFFENSES, even if committed by a particular individual months or years in the past will still be

12  present at the SUBJECT PREMISES in the form of physical and electronic records.

13     12.      Set forth below are:  (1) descriptions of the premises and vehicles to be searched and

14  the basis for believing these locations and vehicles are used by the TARGET SUBJECTS; and (2) the

15  facts regarding the commission of the TARGET OFFENSES that support probable cause for

16  requested search warrants.  A photograph of the premises, as well as a description, is set forth in

17  Attachment A to the particular warrant for each location.  The items to be seized and searched from

18  the SUBJECT PREMISES are set forth in Attachment B (Items to be Seized) to the particular warrant

19  for each location.  Attachment C sets forth the protocol to be used for searching or seizing electronic

20  devices or media.  All attachments are incorporated herein by reference.

21  III.   **LOCATIONS AND VEHICLES TO BE SEARCHED**

22     13.      As set forth in greater detail later in this affidavit, I believe there is probable cause that

23  evidence, fruits, and instrumentalities of the TARGET OFFENSES will be found at and inside the

24  following residences and vehicles used by the TARGET SUBJECTS.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  IV.    PROBABLE CAUSE

25         A.    May 16, 2013 – Seizure of Marijuana from DAVIS at the Nashville Airport

26         46.    On May 16, 2013, Drug Enforcement Administration (DEA) Task Force Officer

27  (TFO) Pilote at the airport in Nashville, Tennessee, approached an arriving passenger from Oakland

28

14

1   named Kameron Kordero Eldridge Davis (DAVIS) and asked DAVIS if he would speak with him.

2   DAVIS agreed.

3      47.    TFO Pilote asked DAVIS if he had any identification and DAVIS provided a

4   California driver's license which identified him as Kameron Davis. TFO Pilote began asking

5   questions about DAVIS' travel. DAVIS appeared to be very nervous and uncomfortable when

6   speaking to TFO Pilote. TFO Pilote asked DAVIS if his backpack was the only luggage that he had

7   with him and DAVIS stated that it was. TFO Pilote asked DAVIS if he would give consent to search

8   the backpack but DAVIS began to question why TFO Pilote wanted to search it. TFO Pilote

9   explained that DAVIS did not have to give consent but that TFO Pilote would like to have a drug

10   detecting K-9 check the bag before DAVIS departed the area. TFO Pilote advised DAVIS that a drug

11   detecting K-9 was being contacted and at that time DAVIS took the backpack, set it at his feet and

12   stated, "what if I just tell you what is in there." TFO Pilote said, "ok" and DAVIS admitted that

13   marijuana was in the bag. DAVIS was then escorted to the DEA office.

14      48.    After being advised of and waiving his <u>Miranda</u> rights, DAVIS consented to a search

15   of the backpack which revealed eleven individual packages of marijuana weighing one pound each.

16   The packages of marijuana were the only items in the backpack. DAVIS stated that he had made two

17   to three previous trips to Nashville and that during all but one of these trips he transported marijuana

18   in his carry-on luggage. DAVIS stated that he had transported a total of 30 pounds of marijuana to

19   Nashville. DAVIS added that his last trip to Nashville was to pick up money only. DAVIS stated

20   that he was introduced to a person in California known to him only as "Antonio" who DAVIS

21   described as a black male, 5'10", and weighing 170 pounds.

22      49.    DAVIS said that Antonio approached him about being paid to transport marijuana and

23   DAVIS agreed. DAVIS stated that he was paid approximately $600 to $800 per trip for transporting

24   the marijuana. DAVIS stated that before each trip Antonio brought the marijuana to his house and

25   instructed him to contact a Southwest employee to assist in getting the marijuana past security.

26   DAVIS stated that before each trip he contacted the Southwest employee at the telephone number

27   provided by Antonio to receive further instructions. DAVIS stated that the Southwest employee met

28   him near the airport early on the same morning that DAVIS was traveling and would take possession

1  of the marijuana. DAVIS stated that the meeting took place around 4:00 a.m. because the Southwest
2  employee worked the morning shift and that the Southwest employee drove a silver or grey sedan.
3       50. ·   DAVIS stated that he would send a text message to the Southwest employee when
4  DAVIS was at the airport and the Southwest employee would give him instructions as to where to
5  meet. TFO Mann located a contact in DAVIS' mobile telephone saved as "Swc" with the mobile
6  number     3764 and DAVIS stated that this stood for "Southwest contact" and that this was
7  the number that DAVIS used to contact the Southwest employee. TFO Mann located text messages
8  in DAVIS' mobile telephone and confirmed that these were the text messages to which DAVIS was
9  referring. DAVIS stated that he would meet the Southwest employee somewhere on the concourse
10 past security and the Southwest employee would give DAVIS the bag containing marijuana. TFO
11 Pilote took photographs of the screen of DAVIS' mobile telephone which show the following text
12 message exchanges between DAVIS and "Swc". The photographs show that on the dates and times
13 set forth below the following text message exchanges occurred:

14     <u>April 30, 2013, 6:48 AM</u>
15     Swc:  What's ur status
16     Davis: in line to go thru sec
17     Swc:  I'm @ the gate 30 bathroom handicap stall
18     Davis: Ok
19     Swc: We're u
20     <u>April 30, 2013, 7:01 AM</u>
21     Swc:  Wait in the bathroom for five mins when u come upstairs
22     Swc:  Go to the sink like u washing ur hands u almost here
23     <u>May 9, 2013, 6:39 AM</u>
24     Swc:  Were u
25     May 16, 2013, 6:43 AM
26     Davis: I'm walkin over there now
27     Swc: hit me when you get there
28

51. DAVIS told TFO Pilote that he knew the person who would receive the marijuana in Nashville only as "R." DAVIS stated that each time he came to Nashville he would meet with R and that DAVIS was supposed to meet with R on the day he was arrested. DAVIS stated that he was supposed to meet with R on the second level of the airport and that DAVIS would then give him the marijuana. DAVIS stated that he would then book his return flight for that same day and fly back to California. TFO Pilote asked DAVIS if he would further his cooperation by placing a call to R and DAVIS agreed.

52. At 3:19 p.m., DAVIS placed a recorded call to ███████9305. The person on the other line stated that he was nervous because he thought that DAVIS had been caught by police. R stated that he would be in a grey Charger. At 3:35 p.m., DEA SA West observed a Silver Dodge Charger with Michigan license plates parked in the temporary parking of the Arrivals level of the airport. Standing next to the open front driver's side of the Charger was a tall black male, later identified as uncharged co-conspirator DC. SA West and TFO Mann approached DC and identified themselves as law enforcement and asked why DC was at the airport. DC explained that he was there to pick up a friend and SA West told DC that agents knew DC was there to pick up DAVIS and a shipment of marijuana and placed him under arrest. DEA Group Supervisor Michael Kress advised DC of his <u>Miranda</u> rights and DC stated that he was willing to be completely honest with the agents.

53. TFO Mann asked DC where the money for the marijuana was located and DC said that it was in the bottom of a backpack that was in the backseat of the car. TFO Mann then located what was later determined to be $23,980 in U.S. currency bundled in rubber bands in a backpack in the backseat of the Charger. DC later explained that on his first trip to Nashville to pick up marijuana from DAVIS he gave DAVIS $15,000 in cash and on his second trip he delivered approximately $12,000 in cash to DAVIS.

54. ACSO personnel at the Airport were informed of the incident. ACSO and Port personnel reviewed badge swipe records and surveillance camera recordings for the morning of May 16, 2013. Surveillance video showed that baggage handler Kenneth FLEMING badged through the secure door to the Vestibule at 4:49 a.m. and then badged back out less than one minute later.

55.     According to records provided by AT&T, the subscriber of the telephone number

listed as "Swc" in DAVIS' mobile telephone is Kenneth Fleming, ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆   This is FLEMING's address of record with CA-DMV. DAVIS' text message to

FLEMING occurred at 4:43 a.m. (it appears the phone adjusted two hours to central time) and

FLEMING entered the Vestibule six minutes later for less than one minute. I therefore believe that

FLEMING brought baggage containing marijuana into the AOA, badged through the security door to

the Vestibule, and gave the baggage containing marijuana to DAVIS for later distribution and sale on

May 16, 2013.

56.     I believe, based on the dates of the text messages set forth above, badge swipe records,

and/or surveillance camera recordings, that FLEMING also entered the Vestibule for the purpose of

passing on baggage containing marijuana on April 30, May 9, May 30, July 18, July 31, November 1,

December 18, 2013, and January 16, February 24, and February 27, 2014.

**B.     July 16, 2013 - Seizure of Marijuana from SESSION at the Phoenix Airport**

57.     On July 16, 2013, FBI, ACSO, and Port personnel conducted surveillance at the

Airport in an effort to detect additional narcotics trafficking and airport security violations. Shortly

after 3:58 a.m., an individual subsequently identified as Major Alexander Session III (SESSION) was

observed walking through Terminal 2 toward the Vestibule. At 4:25 a.m., MAYFIELD used his

badge to travel through the secure door leading from the AOA to the Vestibule. Video surveillance

showed MAYFIELD and SESSION in the Vestibule together for approximately one minute and 30

seconds. MAYFIELD then left the Vestibule and returned to the restricted access area of the

Terminal. SESSION exited the Vestibule carrying a black backpack with silver stripes that was

previously possessed by MAYFIELD and eventually boarded Southwest Flight 3681 to Phoenix,

Arizona. SESSION appeared to be accompanied by a woman later identified as Ahshatae Marie

MILLHOUSE. Both SESSION and MILLHOUSE were flying to Little Rock, Arkansas, with a

scheduled stop in Phoenix.

58.     After SESSION and MILLHOUSE arrived in Phoenix and were awaiting the next leg

of their flight to Little Rock, Phoenix Police Department (PPD) Detectives Gabrick and Romo

approached SESSION and MILLHOUSE in a gate area of the Phoenix airport. Det. Gabrick

identified himself to SESSION and asked if he could speak with him. SESSION said yes and provided Det. Gabrick with his California identification. Det. Gabrick asked SESSION to identify his luggage and SESSION said "these two" in reference to a dog carrier and a green piece of luggage on the floor. Det. Gabrick asked about a dark bag on the floor under the chair next to SESSION and SESSION denied that it belonged to him. Det. Gabrick asked SESSION if he knew who the dark bag belonged to and SESSION said he had no idea and said the bag was there when SESSION arrived. SESSION then reached down, grabbed the bag, and slid it toward Det. Gabrick. Another detective searched the bag and found multiple plastic bags containing marijuana. SESSION was detained and transported to an office.

59.    Det. Gabrick advised SESSION of his <u>Miranda</u> rights which he indicated he understood. SESSION denied any knowledge of the bag. SESSION was then confronted with video surveillance from the airport showing him carrying the dark bag that contained the marijuana. SESSION said nothing and hung his head. Inside the backpack were 14 food saver bags containing suspected marijuana. On six of the bags the letters "OG" were written; on four bags the letters "PURP" were written and the remaining four bags were not labeled. The marijuana was submitted to the DEA Western Regional Laboratory and Forensic Chemist Minh Nguyen determined the substances to be 5.643 kilograms of marijuana.

60.    Det. Gabrick obtained a search warrant to search a Samsung Galaxy cellular telephone that SESSION possessed at the time of his arrest. A search of the phone revealed numerous photographs, some of which depicted: (1) SESSION with large amounts of cash as well; (2) marijuana; and (3) SESSION with an individual later identified as co-conspirator Travon Baker, aka "Trigga Tray."

61.    Det. Gabrick handwrote a number of phone numbers from the contacts list of SESSION's phone. One of those contacts was listed under "TBABY" with a telephone number of ██████ 8057. The subscriber to this telephone number is Laticia MORRIS (MORRIS). ████████ ██████ Little Rock, Arkansas. While SESSION was being held in the Maricopa County Jail he made recorded telephone calls between July 16 and July 19, 2013. In one call on July 18, SESSION

1  called telephone number ▓▓▓▓ 4329 and spoke with a female he identified as "Juicebox." Some

2  of this conversation is set forth below.

3       SESSION:   I need you to try to call this number so I can get my money. My uncle about to

4                      go out to Arkansas to get my money, but I need you to call this number and see

5                      when she getting back.

6       Juicebox:   Alright, you want me to call her on three-way?

7       SESSION:   Yeah, do it on three-way.

8       Juicebox:   What's the number?

9       SESSION:   ▓▓▓ 3057

10      62.    After several attempts, Juicebox was able to successfully place a three-way call to

11  ▓▓▓ 8057, the number listed in SESSION's contacts as "TBaby" and subscribed to MORRIS.

12  A female believed to be MORRIS answered the call and the following conversation occurred:

13       SESSION:   TBaby.

14       MORRIS:   What's up?

15       SESSION:   You talked to my uncle?

16       MORRIS:   Yeah, he called me today.

17      63.    For reasons set forth later in this affidavit, I believe that SESSION's uncle is Donald

18  Ray Holland (HOLLAND) and that he is a member of the DTO. SESSION was eventually released

19  and resumed his activities on behalf of the DTO.

20      64.    According to a criminal history report, SESSION has previously been convicted of:

21  (1) Possession of Concentrated Cannabis, a felony, in violation of California Health and Safety Code

22  Section 11357(A), on or about February 16, 2010, in Alameda County Superior Court; and (2)

23  Possession of Marijuana for Sale, a felony, in violation of California Health and Safety Code Section

24  11359, on or about October 28, 2011, in Alameda County Superior Court. SESSION was on

25  probation for both offenses at the time of his arrest in Phoenix.

26

27

28

1   **C.    October 29, 2013 – Seizure of Marijuana and Phones from MOLTON at the New**
2           **Orleans Airport**

3       65.     On October 29, 2013, FBI, ACSO, and Port personnel conducted surveillance at the

4   airport in an effort to detect additional narcotics trafficking and airport security violations. At 4:28

5   a.m., MAYFIELD was observed carrying a black backpack with silver striping. At 4:33 a.m., an

6   individual later identified as MOLTON was observed walking with a black rolling suitcase with a

7   distinctive red tag on the front. After MOLTON had cleared the TSA security checkpoint he entered

8   the Vestibule area in Terminal 2. At 4:37 a.m., MOLTON entered the men's restroom just to the side

9   of the Vestibule. At 4:40 a.m., MAYFIELD used his badge to travel from the AOA to the Vestibule

10  and into the adjacent men's restroom that MOLTON had entered minutes before. At 4:41 a.m.,

11  MAYFIELD exited the restroom and walked back through the Vestibule area and through the secure

12  door into AOA. As he did so, MAYFIELD had the black bag with the distinctive red tag on it that

13  MOLTON had brought into the restroom. MOLTON then exited the bathroom in possession of the

14  black backpack with the silver striping that MAYFIELD brought into the bathroom.

15      66.     At 6:05 a.m., MOLTON was in line to board Southwest Flight 2352 destined for

16  Houston, Texas, and then New Orleans, Louisiana. After MOLTON exited his Southwest flight in

17  New Orleans he was approached by Detective Joshua Collins of the Jefferson Parish Sheriff's Office.

18  Det. Collins asked MOLTON a series of airport security questions including whether or not

19  MOLTON had packed his luggage. MOLTON said that he did not pack his bag and found it in

20  Houston and did not know what was in it. MOLTON provided consent to Det. Collins and other

21  officers to search MOLTON and his luggage. MOLTON stated that he did not think there was

22  anything illegal in his luggage but if there was it was not his. A drug sniffing dog alerted to the

23  presence of narcotics in MOLTON's luggage (a black backpack with silver striping matching the one

24  that MAYFIELD brought into the men's restroom in Oakland). Inside the backpack were ten one-

25  pound vacuum sealed bags containing suspected marijuana. MOLTON was on felony probation at

26  the time of his arrest in New Orleans and was subject to the standard four-way search clause. At the

27  time of his arrest in New Orleans, MOLTON was in possession of two mobile telephones. The

28  marijuana seized from MOLTON was submitted for analysis to the Jefferson Parish Sheriff's Office

1   Crime Laboratory and Forensic Scientist Raven Barrois determined the substances to be 4.712

2   kilograms of marijuana.

3         67.    On November 27, 2013, a federal search warrant for these devices was obtained and

4   later executed. A search of one of the mobile telephones revealed a photograph of an undetermined

5   amount of cash lying on a bed next to what appears to be marijuana and a photograph of what appears

6   to be three frozen bundles of marijuana. In addition, the mobile phone contained numerous text

7   message exchanges evidencing drug trafficking and the conspiracy to circumvent airport security.

8   Some of those exchanges are set forth below:

9         <u>August 22, 2013</u>

10        KK:        Bro how many times u wanna hoop every month

11        MOLTON:   Twice

12        KK:        My nigga got a one way for 225

13        KK:        When u want it

14        MOLTON:   Today, and can we go Saturday still

15         68.    Based on my training, experience, and knowledge of this investigation, I believe that

16   "KK" is MAYFIELD. The number associated with "KK" in MOLTON's phone was &#9608;&#9608;&#9608;&#9608;8997.

17   According to Verizon, on August 22, 2013, this telephone number was subscribed to a woman at

18   &#9608;&#9608;&#9608;&#9608;n Hayward, California. According to Verizon the account was discontinued in October

19   2013. However, on December 16, 2013, MAYFIELD provided &#9608;&#9608;&#9608;&#9608;8997 as his number to the

20   Port of Oakland for a Security Identification Display Area (SIDA) update. Based on my knowledge

21   that individuals engaged in criminal activity frequently use telephones subscribed to others or in false

22   names, I believe that KK is MAYFIELD. Accordingly, during this conversation I believe MOLTON

23   and MAYFIELD were arranging for the transportation of narcotics through the Oakland Airport.

24   Specifically, I believe that MAYFIELD was asking MOLTON how many times per month MOLTON

25   wanted to transport narcotics to which MOLTON answered twice. MAYFIELD then stated that he

26   had a one way airline ticket for $225 ("225"). Finally, MOLTON stated that he would purchase the

27   ticket that day but would fly on Saturday.

28

August 24, 2013

| | | |
|---|---|---|
| 2 | MOLTON: | I need that bag back to bra! |
| 3 | KK: | Lol fuck u this mine |
| 4 | MOLTON: | Lol. Just like the rest of them huh! |
| 5 | MOLTON: | That`s about two hundred right there |
| 6 | MOLTON: | Tell cuz im at the booth |
| 7 | MOLTON: | Getting back on in Denver |
| 8 | MOLTON: | Just landed |

69.   Based on my training, experience, and knowledge of this investigation, I believe that during this text message exchange MOLTON asked MAYFIELD to return one of the bags that they swapped in the airport. My belief is based in part on surveillance footage showing MAYFIELD switching bags with couriers at the airport. MAYFIELD then joked that the bag was his and MOLTON responded "like the rest of them" which I believe indicates that MAYFIELD and MOLTON have exchanged bags in the airport numerous times and that MAYFIELD has kept the bags that MOLTON gave him. MOLTON further stated that the bag cost about two hundred dollars. At the end of the conversation, I believe MOLTON and MAYFIELD discussed the need to obtain a new ticket in Denver.

September 22, 2013

| | | |
|---|---|---|
| 19 | KK: | If u want to go in the am still let me no |
| 20 | MOLTON: | Monday or Tuesday |
| 21 | KK: | Mon |
| 22 | KK: | Bra we gotta be on fasho in day am I picked up |
| 23 | MOLTON: | Bra the first flight is sold out, so do you want to go and I`ll leave tomorrow |
| 25 | MOLTON: | Are I`ll take the next flight |
| 26 | KK: | We gotta go up do u have yo fit ready |
| 27 | MOLTON: | Yeah, you got my bag? |

70.     Based on my training, experience, and knowledge of this investigation, I believe that during this conversation MAYFIELD and MOLTON discussed the arrangements for MOLTON's departure to travel to a destination city with marijuana and whether MAYFIELD had the bag ready for pickup. This is not the first time that MOLTON received a bag from a Southwest baggage handler. On June 22, 2013, at 4:41 a.m., MOLTON checked in for his 6:05 a.m. Southwest flight from Oakland to New Orleans with a connection in Denver. At 4:48 a.m., Southwest baggage handler Michael Herb Videau (VIDEAU) used his security badge to travel from the AOA through the security door and into the Vestibule. A security camera recording shows VIDEAU carrying a large roller bag and walking through the passenger terminal towards the nearby men's room. At 4:49 a.m., a security camera recording shows MOLTON (who is identifiable from the video) walking with one roller bag into the Vestibule at which point he is seen on his phone. MOLTON then exited the Vestibule and walked toward the men's bathroom just past the Vestibule. At 4:53 a.m., VIDEAU walked back into the Vestibule without any bag and badged through the security door back to the AOA. At 4:54 a.m., the security camera then shows MOLTON walking back through the terminal past the Vestibule pulling two roller bags. MOLTON eventually boarded his flight to Denver. Based on the recording, and the fact that very few people were in the airport at this time, and the fact that VIDEAU and MOLTON both had one bag, then went in the same direction, and VIDEAU returned with no bags and MOLTON had two bags, I believe that VIDEAU and MOLTON met in the restroom and VIDEAU provided MOLTON with baggage containing marijuana intended for distribution in New Orleans (just as MAYFIELD did on October 29, 2013).

**D.     February 10, 2014 – Seizure of Marijuana at Little Rock Airport and Arrest of SESSION, JAMERSON, and BAKER**

71.     On February 10, 2014, I conducted surveillance in Terminal 2 of the Airport with other Agents. At 4:30 a.m., an individual later identified as Clyde Barry JAMERSON Jr. entered the Vestibule. At 4:30 a.m., MAYFIELD used his badge to travel from the AOA to the Vestibule. MAYFIELD was observed carrying a black, grey, and white backpack. MAYFIELD approached JAMERSON in the Vestibule and handed JAMERSON the black, grey, and white backpack. JAMERSON walked away from the Vestibule and sat down at Gate 30 in Terminal 2. At 4:35 a.m.,

24

MAYFIELD exited the airport. MAYFIELD was not carrying any type of bag when he departed the airport. At 6:00 a.m., JAMERSON boarded Southwest Flight 651 to Phoenix, Arizona, with a connecting flight aboard Southwest Flight 1927 to Little Rock, Arkansas.

72.     Based on information provided by law enforcement personnel in Oakland, FBI SA Woodie and Officer Ward contacted JAMERSON immediately after he deplaned from Southwest Airlines Flight 1927 at Little Rock National Airport at 1:50 p.m. on February 10, 2014. SA Woodie and Officer Ward informed JAMERSON that it was necessary to speak with him. After SA Woodie displayed his credentials, JAMERSON agreed to speak with the interviewing Agents. FBI SA Woodie and SA Hubbard, along with Officer Ward and Narcotics Detective Ryan Hudson from LRPD, brought JAMERSON into an office at the Little Rock National Airport for an interview.

73.     JAMERSON stated that he had traveled to Little Rock, Arkansas from San Francisco, California, with a layover in Phoenix, Arizona. JAMERSON obtained a "buddy pass" from a friend who was employed by Southwest Airlines to gain entry to the flight, but JAMERSON could not recall the name of this friend. JAMERSON stated that he had previously traveled to Arkansas on three occasions, but could not recall the purpose of his prior travel to Arkansas. On this occasion, JAMERSON stated that he had traveled to Arkansas to visit his niece and her friends, but could not recall any of their names. JAMERSON initially stated that he was going to stay with friends, but later advised that he was planning on staying at a hotel. JAMERSON could not recall the name of the person who was supposed to pick him up from the Little Rock National Airport.

74.     JAMERSON was observed with a dark blue canvas duffel bag and a blue and white nylon backpack in his possession when he exited the aircraft at Little Rock National Airport. During the interview, JAMERSON admitted that he had maintained possession of both the dark blue duffel bag and the backpack since he arrived at the airport in San Francisco, California.

75.     During the interview, JAMERSON was asked if he had a cell phone and responded in the affirmative. JAMERSON removed the telephone from his front left pants pocket and laid it on the desk in the office in which the interview was being conducted. JAMERSON stated that he had not let anyone use or possess his telephone in the last 24 hours. JAMERSON stated he is the only one who uses the telephone and stated his telephone number was ████████6603.

76.     JAMERSON's cellular telephone rang repeatedly throughout the interview. After looking at the face of the phone while ringing, JAMERSON informed agents that the telephone number calling his belonged to Major SESSION of Oakland, California. JAMERSON stated that SESSION was present in Little Rock to pick JAMERSON up from the airport. JAMERSON provided permission for Agents to look at an incoming text message on his telephone. JAMERSON stated that the text message had come from SESSION. Agents observed that the text message from SESSION's phone stated, in effect, when you come out, put it in the trunk. JAMERSON admitted to Agents that the "it," referred to in the text message from SESSION, was in reference to the blue and white backpack in JAMERSON's possession. JAMERSON stated that SESSION would be driving a grey Honda Accord.

77.     JAMERSON denied SA Woodie and SA Hubbard consent to search the blue and white backpack in his possession. The Agents advised JAMERSON that they could smell the odor of marijuana emitting from his backpack. JAMERSON denied any marijuana being present in his backpack and again refused consent for the Agents to search it. LRPD Det. Hudson brought his assigned K-9 "Kazzie" into the interview room and Detective Hudson advised that "Kazzie" had positively alerted on the presence of narcotics in JAMERSON's bags. Following the positive alert to the presence of narcotics, SA Woodie advised JAMERSON that the backpack would be searched. At this time, JAMERSON spontaneously stated "you already know what's in there . . . ."

78.     SA Woodie explained to JAMERSON that he was under arrest and placed JAMERSON in handcuffs while they inspected the blue and white backpack. While Agents were opening the backpack, JAMERSON stated that the backpack was full of marijuana. After opening the backpack, multiple packages of a green leafy substance were observed in vacuum sealed packages. One of the packages was observed to have the word "purp" written on the top of it with a permanent marker. SA Woodie, SA Hubbard, and LRPD Det. Hudson all noted the strong odor of marijuana emitting from the backpack and packages. The total amount of suspected marijuana was fourteen pounds.

79.     Following his arrest, JAMERSON's telephone began to ring repeatedly, again showing the number JAMERSON had stated belonged to SESSION. JAMERSON was afforded the

1  opportunity to cooperate with Agents, which he accepted. JAMERSON was instructed to answer the

2  telephone call and to tell the caller that JAMERSON was in the airport and would be coming out

3  shortly. SA Woodie and SA Hubbard both heard a male voice on the call reply "ok."

4        80.    While being led out of the airport by SA Woodie and Officer Ward, JAMERSON

5  observed a car in the short term parking spot near the front of the airport entrances and stated that car

6  belonged to SESSION. The vehicle, a grey Toyota Camry bearing Arkansas license plate number

7  084NFW, was located in the short term parking lot along with three male occupants. Officer Ward

8  contacted the three individuals, later identified as Major Alexander Session III (SESSION), Travon

9  Jahwal Franzwa Baker (BAKER)                    . LRPD Officer

10  Ward arrested and charged      SESSION, and BAKER in conjunction with the suspected

11  marijuana seized from JAMERSON and multiple mobile telephones in their possession were seized.

12        81.    According to a criminal history report, BAKER was previously convicted of: (1)

13  Possession/Purchase Cocaine Base for Sale, in violation of California Health & Safety Code Section

14  11351.5 (as a juvenile); (2) Carrying a Loaded Firearm in a Public Place in violation of California

15  Penal Code Section 12031(a)(1) (as a juvenile); (3) Possession of Marijuana for Sale, in violation of

16  California Health & Safety Code Section 11359 (as a juvenile); and (4) Possession of Concentrated

17  Cannabis, in violation of California Health and Safety Code Section 11357(a), a misdemeanor, in

18  Alameda Superior Court, on or about April 25, 2012.

19        **E.**    **Text Messages from JAMERSON's Phone**

20        82.    I obtained and subsequently executed a federal search warrant for the mobile

21  telephones seized on February 10, 2014. Searches of the mobile phone seized from JAMERSON and

22  one of the mobile telephones seized from SESSION revealed numerous text message exchanges

23  evidencing the TARGET OFFENSES (including text messages sent the day of SESSION's arrest).

24  Some of those exchanges are set forth below:

25       February 9, 2014, at 9:40 p.m.

26       keKe (MAYFIELD):     Zf4lxm

27        83.    The number listed for "keKe" in the Contacts section of JAMERSON's phone was

28       8002. Thus, I believe that in early February 2014 this telephone was being used by

1  MAYFIELD (who uses the monikers of KK, keKe, and Richkid) and that MAYFIELD was providing

2  JAMERSON with a Southwest Airlines flight confirmation code on February 9, 2014, for a flight the

3  following day from Oakland, California, to Little Rock, Arkansas in order to transport marijuana for

4  further distribution.

5          <u>February 10, 2014, from 3:49 a.m. to 4:02 a.m.</u>

6          keKe (MAYFIELD):     Cuzo Richkid

7          JAMERSON:            Fasho

8          keKe (MAYFIELD):     Are u around Richkid

9          JAMERSON:            Almost there

10          keKe (MAYFIELD):     Were to the station Richkid

11          JAMERSON:            Yea

12          keKe (MAYFIELD):     Ok same one Richkid

13          JAMERSON:            Yup

14          JAMERSON:            Here

15         84.     I believe that in this exchange, JAMERSON made arrangements to meet MAYFIELD

16  at a gas station in close proximity to the Airport in the early morning hours of February 10, 2014, so

17  that JAMERSON could provide MAYFIELD with a bag containing quantities of marijuana that

18  MAYFIELD would then transport around the TSA security checkpoint and provide to JAMERSON

19  in the passenger terminal of the Oakland airport. JAMERSON would then carry the bag containing

20  marijuana as carry-on luggage on a Southwest flight to Little Rock.

21          <u>February 10, 2014, at 4:30 a.m.</u>

22          JAMERSON:          Here

23          keKe (MAYFIELD):    Ok Richkid

24         85.     The text message exchange above occurred at 4:30 a.m. on February 10, 2014, and

25  coincides with the surveillance footage of JAMERSON and MAYFIELD entering the Vestibule.

26  Therefore, I believe that JAMERSON and MAYFIELD used the text message features of their mobile

27  telephones to arrange to meet each other in the Vestibule.

28

February 10, 2014, from 4:49 a.m. to 5:55 a.m.

keKe (MAYFIELD):        Let me no when u on Richkid

JAMERSON:               Aight don't let your phone go dead

keKe (MAYFIELD):        Aite

JAMERSON:               I'm on

keKe (MAYFIELD):        Fasho

86.     I believe that in the text message exchange above, JAMERSON notified MAYFIELD that he had made it to his scheduled gate and was boarding his flight at that time.

February 10, 2014, from 8:44 a.m. to 8:54 a.m.

JAMERSON:               On my way tell Ol boy to have some room monkey

keKe (MAYFIELD):        Lol ok Richkid

JAMERSON:               Lol see if you can put something on line for Friday

keKe (MAYFIELD):        Ok are u bout to board Richkid

JAMERSON:               Right now

keKe (MAYFIELD):        Ok Richkid

JAMERSON:               I'll hit you when I touch

87.     I believe that in the text message exchange above, JAMERSON was telling MAYFIELD that he had arrived at his layover destination in Phoenix, Arizona, and was preparing to board his connecting flight to Little Rock, Arkansas. I further believe that JAMERSON was inquiring whether MAYFIELD could make arrangements for him to return to Oakland, California on Friday, February 14, 2014.

February 10, 2014, at 11:40 a.m.

JAMERSON:               Just landed

88.     I believe that in the text message exchange above, JAMERSON notified MAYFIELD that he had just landed in Little Rock, Arkansas aboard Southwest Airlines flight 1927 at 11:40 a.m. California time, which would be 1:40 p.m. local time in Little Rock.

F.    **Text Messages Retrieved from SESSION's Mobile Telephone**

89.    On February 10, 2014, there were a series of text message exchanges between SESSION and the telephone number ████8002 (MAYFIELD) which was listed in SESSION's Contacts section as "Fag1", and SESSION and the telephone number ████6603 (which was the telephone number of the mobile phone seized from JAMERSON on February 10, 2014) which was listed in SESSION's Contacts section as "Fag2." Set forth below are text messages exchanges between SESSION, JAMERSON, and MAYFIELD, from February 10, 2014, at the times below:

| Time | Sender | Receiver | Text Message |
|---|---|---|---|
| 12:42 p.m. | Fag1 (MAYFIELD) | SESSION | He just got there bruh  Richkid |
| 12:43 p.m. | SESSION | Fag1 (MAYFIELD) | Who is it cus |
| 12:45 p.m. | Fag1 (MAYFIELD) | SESSION | Cj  Richkid |
| 12:46 p.m. | SESSION | Fag1 (MAYFIELD) | Wat da number |
| 12:47 p.m. | Fag1 (MAYFIELD) | SESSION | ████6603  Richkid |
| 12:49 p.m. | SESSION | JAMERSON | Just throw it nda trunk |
| 1:23 p.m. | ████8057 (MORRIS) | SESSION | Don trynna cal u he said u not pickn up  ·-#1 BRAIDER |
| 1:43 p.m. | Fag1 (MAYFIELD) | SESSION | Whats goin on  Richkid |
| 4:17 p.m. | Fag1 (MAYFIELD) | SESSION | Did yall get pulled over  Richkid |

90.    I believe that during this text message exchange MAYFIELD was telling SESSION (who was in Little Rock) that the courier had arrived in Little Rock at approximately 12:42 p.m. on February 10, 2014. When SESSION inquired who the courier was, MAYFIELD responded "Cj," which I believe to be a reference to Clyde JAMERSON because "Cj" are his initials and he landed in Little Rock with marijuana. I believe that SESSION then asked MAYFIELD for JAMERSON's telephone number so that he could contact him and coordinate the pick-up of JAMERSON and the marijuana he carried. In response, MAYFIELD provided SESSION with telephone number ████6603 which was the number of the mobile telephone seized from JAMERSON and which

1  JAMERSON provided to the interviewing agents in Little Rock as belonging to him. I further believe

2  that the last two texts were sent by MAYFIELD to SESSION because MAYFIELD became

3  concerned that he had not heard from SESSION and asked SESSION "Did yall get pulled over"

4  because MAYFIELD was correctly concerned that JAMERSON and SESSION had been intercepted

5  by law enforcement personnel. Phone service over ████████8002 (MAYFIELD's phone) was

6  subsequently discontinued. I believe that MAYFIELD stopped using this mobile telephone after the

7  arrests on February 10, 2014, in order to avoid detection and arrest by law enforcement personnel.

8      91.    I believe the text message from ██████8057, subscribed to and used by Laticia

9  MORRIS, that "Don" was trying to call SESSION meant that co-conspirator Donald HOLLAND was

10  attempting to reach SESSION. Call detail records show that on February 10, 2014, at 12:22 p.m., a

11  phone number connected to HOLLAND placed a 31-second phone call to MORRIS. Around the

12  same time, there were multiple unanswered calls to SESSION from a pre-paid subscriberless mobile

13  telephone with a Las Vegas area code that SESSION had indexed in his phone as "Work" even

14  though SESSION does not appears not to be employed. As explained, HOLLAND has connections

15  to Las Vegas and I believe he was trying to contact SESSION to be sure the marijuana arrived in

16  Little Rock and when he failed to reach SESSION on his "burner" phone he then used his own phone

17  to call SESSION's girlfriend and co-conspirator MORRIS.

18      G.    **Videos/Photographs Recovered from BAKER's Mobile Telephones**

19      92.    Set forth below are descriptions of photographs, videos, and text messages exchanges

20  retrieved from BAKER's two mobile telephones. One photograph on an Alcatel depicts BAKER

21  with multiple cellular telephones on his lap. Another photograph shows a large stack of U.S.

22  currency, including multiple $50.00 bills. There is also a screen shot of an American Airlines

23  reservation in the name of Travon F. Baker for a flight from San Jose, California, to Dallas-Fort

24  Worth, Texas, to Little Rock, Arkansas on January 23, 2014, as well as a screenshot of a United

25  Airlines reservation in the name of Travon Baker for a flight from Little Rock, Arkansas, to Denver,

26  Colorado, to San Francisco, California on February 12, 2014. These photographs demonstrate that

27  the Alcatel mobile telephone belonged to BAKER and the photographs depict the proceeds of

28  BAKER's narcotics trafficking.

93.     In BAKER's Samsung mobile telephone there were multiple photographs of BAKER posing with large stacks of U.S. currency, expensive custom jewelry, and luxury automobiles. One photograph shows BAKER sitting in an automobile with a large stack of U.S. currency, and five mobile telephones on his lap. Another photograph shows SESSION posing with a large stack of U.S. currency, and another photograph shows BAKER and SESSION together on four-wheel all-terrain vehicles in the snow in Arkansas. There were also numerous videos of BAKER on his Samsung mobile telephone.

94.     One video, apparently taken on January 23, 2014, shows BAKER looking out the window of a landing airplane. I believe that this is a video of BAKER landing in Little Rock, Arkansas, after flying from San Jose, California. Multiple videos apparently taken on January 24, 2014, show BAKER handling at least twenty banded stacks of U.S. currency, including $100 bills and $20 bills. A person believed to be BAKER can be heard in one of the videos saying, "That's some more weed money." "Weed" is a slang term for marijuana. Another video depicts BAKER with an additional shoe box containing more stacks of banded U.S. currency and a person believed to be BAKER can be heard saying, "Ain't no ones ($1.00 bills), might be a few tens ($10.00 bills) and fives ($5.00 bills), but ain't no ones ($1.00 bills)."

95.     A video apparently taken on January 26, 2014, shows BAKER in an unidentified airport terminal. In the video, BAKER can be seen and heard saying to the camera, "I'm in the airport with hella bands on me nigga. For real nigga, I'm about to cop. About to go trippin' on niggas, nigga." I believe that in this video BAKER was telling the camera that he had large sums of U.S. currency on his person and that he is getting ready to fly to an unknown destination to purchase narcotics. We believe that BAKER uses the term "bands" to describe large amounts of U.S. currency banded together. In another video, apparently taken on January 26, 2014, shows BAKER in the terminal of the same unidentified airport speaking to the camera. BAKER can be seen and heard telling the camera, "Where you think I'm at? What you talkin' about airport? Nigga, I'll be there in no time. You know I got bands on me. I ain't gonna show them, damn feds might be somewhere around here (the video depicts BAKER then looking around). Nah, I'll be there in a minute though.".

96. A video apparently taken on February 8, 2014, depicts BAKER and SESSION having a snow-ball fight outside of a residence. The video shows BAKER running behind a parked vehicle bearing Arkansas license plates.

**H.   BAKER's Instagram Posts**

97. I have also reviewed numerous posts made by BAKER to his publicly available Instagram account ███████████. Descriptions of some of the photographs posted by BAKER are set forth below.

98. A photograph apparently taken at 1:43 p.m. on April 30, 2014, shows a leather bag open with a large stock of money including $100, $20, and $5 bills. The text below the photograph reads: Gucci bag full of cash that's spending money.

99. A photograph apparently taken on May 7, 2014, shows BAKER bending over a large bag containing what appear to be marijuana buds and grabbing a handful of them out of the bag. The text below the photograph reads: How you niggaz pushing traplife and never had traphouse…this what made me.

100. A photograph apparently taken at 11:00 p.m. on May 10, 2014, shows a large amount of U.S. currency including $100, $50, $20, and $5 bills. Under some of the cash there appears to be the end of a pistol grip with an extended magazine inserted into the grip.

101. A photograph apparently taken at 6:40 p.m. on May 18, 2014, shows a large stack of $100 bills. The text below the photograph reads: The same niggaz that was taxing me on zips back in the days asking for a hand out and the same niggaz that was rushing all the knocks mad because I'm the now (multiple symbols of a muscular arm flexing) tables turned that young boy done grown up #40.

102. A photograph apparently taken at 6:55 a.m. on May 19, 2014, shows the inside of what appears to be a courtroom. The flags behind the bench appear to be the American flag and the state flag of Arkansas. The text below the photograph reads: When you playing out of stat you gotta be playing with some cake #courtFlow. I believe that BAKER and SESSION traveled to Little Rock, Arkansas around May 19, 2014, and went to state court, possibly to see JAMERSON.

103.   A photograph apparently taken at 11:32 a.m. on June 20, 2014, shows BAKER standing in the street holding what appears to be a large stack of U.S. currency.  The text below the photograph reads:  #drugmoney.

104.   A photograph apparently taken on June 24, 2014, shows BAKER holding a large stack of U.S. currency including a $100 and $20 bill.  The text below the photograph reads:  It ain't hard to make a few G's a day.

105.   A photograph apparently taken at 2:39 p.m. on July 17, 2014, shows multiple pieces of expensive looking jewelry, to include custom gold necklaces and jewel-encrusted watches, pendants, and rings.  The text below the photograph reads: if I was to add my pink slips that's well over 100k spent (series of stacks of currency) I'm 22 now can you please tell me what nigga in my age bracket fucking with me?

106.   A photograph apparently taken at 7:30 p.m. on August 3, 2014, shows a chalkboard bearing a hand-written message which reads: Everybody clicking up LOL the bigger the click the quicker they snitch that just make and much easier target (graphics showing a target with an arrow in the center and a pistol firing at it).

107.   A photograph posted on January 28, 2015, shows BAKER sitting on a curb with his right hand down his pants.  The text below the photograph reads: Tell the F.E.D.S if they coming better come now I got my chip straight now I'm ready to retire on this #sunnysideBlock

108.   Two photographs posted on April 24, 2015 show BAKER holding a large stack of U.S. currency.  A video posted on April 24, 2015, shows BAKER driving in a vehicle and singing to the radio while counting a large stack of U.S. currency, including $100 bills.

I.   **June 9, 2014:  Seizure of Marijuana Shipped by MAYFIELD to DAVILLIER in New Orleans, Louisiana**

109.   I have reviewed a report prepared by ACSO Det. Cutonilli on June 10, 2014.  According to the report, Det. Cutonilli learned that MAYFIELD had shipped a box weighing about thirty-seven pounds through Southwest Airlines Cargo to Brandon DAVILLIER in New Orleans, Louisiana.  I understand that Southwest Airlines allows employees to ship items on its planes at a reduced rate if space is available.  In light of MAYFIELD's previous use of his position with

34

1  Southwest Airlines to transport marijuana to other cities in the country, particularly in the Southeast, I

2  contacted officials at the airport in New Orleans to alert them that I believed MAYFIELD had

3  shipped a package containing marijuana to the New Orleans airport via Southwest Cargo.

4      110.   I have reviewed a report prepared by Detective Brandon Veal from the Jefferson

5  Parish Sheriff's Office (JPSO) regarding the arrest of Brandon Davillier (DAVILLIER) and Ryan Lee

6  (LEE) in New Orleans, Louisiana. According to the report, at 6:30 p.m., based on the information

7  provided regarding the package shipped via Southwest Cargo by MAYFIELD, Det. Veal and others

8  intercepted the package upon its arrival at the airport in New Orleans. Deputy Marcus Borne and his

9  canine conducted an exterior sweep of the package. The canine was trained in the odor recognition of

10  illegal narcotics. During the exterior sweep of the package, the canine alerted to the presence of

11  narcotics inside the package. Based on this alert and the information provided regarding the package,

12  Detective Veal sought and obtained a search warrant for the package. Sgt. Collins opened the

13  package pursuant to the warrant and discovered four bags that contained vegetable matter consistent

14  with marijuana. A subsequent field test would later indicate that the substance was 11.325 kilograms

15  of marijuana. Law enforcement officers waited for individuals to arrive and pick up the package.

16      111.   At 9:25 p.m., two individuals arrived in a vehicle to pick-up the package. The driver

17  of the vehicle was    and the passenger was DAVILLIER. DAVILLIER exited the vehicle and

18  entered Southwest Cargo to retrieve the package while    remained in the vehicle. DAVILLIER

19  entered Southwest Cargo and requested the package. After he was given the package and exited

20  Southwest Cargo DAVILLIER and    were arrested. Four mobile telephones were recovered from

21  inside the vehicle. These devices were searched pursuant to a federal search warrant.

22      112.   In one of the phones that appeared to belong to DAVILLIER based on its contents,

23  there were text messages sent to and from DAVILLIER and MAYFIELD related to the TARGET

24  OFFENSES and text messages sent to and from DAVILLIER and an unknown co-conspirator

25  relating to MAYFIELD and the TARGET OFFENSES. Some of these text messages are set forth

26  below. Where no time or date is listed it is likely a result of the recovery of DAVILLIER's side of a

27  deleted text message exchange.

28

| | | |
|---|---|---|
| 1 | <u>DAVILLIER and MAYFIELD, Unknown Date and Time</u> | |
| 2 | DAVILLIER: | Western union |
| 3 | DAVILLIER: | 330 |
| 4 | DAVILLIER: | Bout to go to walmart in a min |
| 5 | DAVILLIER: | Bout to now. Send me the air bill |
| 6 | DAVILLIER: | I'm at walmart now |
| 7 | DAVILLIER: | Bout to do it in a few |
| 8 | DAVILLIER: | Go to western union. Walmart system down |
| 9 | DAVILLIER: | I just pulled up to western. Bout to send 500 |
| 10 | DAVILLIER: | I'm in line |
| 11 | DAVILLIER: | Bout to meet up with my boy to get the rest yo money |
| 12 | DAVILLIER: | █2889 |
| 13 | DAVILLIER: | Sent from me new orleans |
| 14 | DAVILLIER: | Because I called so early? |
| 15 | DAVILLIER: | Damn son. My bad |
| 16 | DAVILLIER: | 330 Right? |

17   113.   In these text messages to MAYFIELD, I believe that DAVILLIER was making

18   arrangements to send money, via Western Union and Walmart, to MAYFIELD as payment for

19   narcotics received or the proceeds of narcotics sold.

20   114.   Set forth below are text messages sent from DAVILLIER to an unknown co-

21   conspirator using a telephone with a Mississippi area code.

| | | |
|---|---|---|
| 22 | <u>DAVILLER and █2871, Unknown Date and Time</u> | |
| 23 | DAVILLIER: | I talked to ki. its all good |
| 24 | DAVILLIER: | Td |
| 25 | DAVILLIER: | Call kiki |
| 26 | DAVILLIER: | █8859 |
| 27 | DAVILLIER: | Aite |
| 28 | DAVILLIER: | This run went smooth |

| 1 | DAVILLIER: | once it td out Here |

1  DAVILLIER:      once it td out Here

2  DAVILLIER:      I coulda sent u money yesterday to send something out

3  DAVILLIER:      ███████████ slidell,la 70461

4      115.   I believe that 'Ki' and 'kiki' are the same person and are a reference to MAYFIELD's

5  moniker.  I further believe that the user of ████████2871 is involved in narcotics trafficking, as well

6  as the transfer of narcotics trafficking proceeds, with DAVILLIER.  I further believe that

7  DAVILLIER was providing the user of ████████2871 with his current home address in Slidell,

8  Louisiana so that he or she could send something (such as payment for narcotics) to his residence.

9      116.   Set forth below are text message exchanges between DAVILLIER and the user of

10  ████████2871 and DAVILLIER and MAYFIELD from May 26, 2014:

11  <u>May 26, 2014:  DAVILLIER and ████████2871</u>

12  (228) 213-2871:     Call kiki

13  (228) 213-2871:     ████8859

14  (228) 213-2871:     Aite

15  <u>May 26, 2014:  MAYFIELD and DAVILLIER</u>

16  Ki (MAYFIELD)     Aite

17  Ki (MAYFIELD)     Yep

18  Ki (MAYFIELD)     Did u pick that up yet

19  Ki (MAYFIELD)     I have to go to the house to see if u can just use yo id

20  Ki (MAYFIELD)     67385872

21  Ki (MAYFIELD)     Dude let me no when u send it cuz they closing early

22  Ki (MAYFIELD)     Dude they close early so u gotta do it like now

23  Ki (MAYFIELD)     When

24      117.   I believe that MAYFIELD was asking DAVILLIER if he picked up a cargo package

25  sent from MAYFIELD via the Southwest Cargo on May 26, 2014 (as shown in the chart below,

26  MAYFIELD shipped numerous packages via Southwest Cargo to DAVILLIER, including on May

27  26, 2014).  The Southwest Cargo manifest shows the airbill number for this cargo shipment was

28

1  67385872. I also believe that MAYFIELD was soliciting DAVILLIER to send a payment for the

2  narcotics, likely via Western Union, Walmart.

3      118.   Set forth below are text message exchanges from the user of ▆▆▆▆2871 to

4  DAVILLIER:

5      May 29, 2014: DAVILLIER and ▆▆▆2781

6      (228) 213-2871:   Make sure you take that stack out for kiki that we had to pay

7      (228) 213-2871:   They aint pay for nothing to help get it out there an p bought her more

8                      shoes yesterday

9      (228) 213-2871:   You should have for at least one, i got a p of shake and like a hp or

10                       around there of some sour that land tomorrow.

11     (228) 213-2871:   Not really unless its just our money.

12     119.   I believe that the user of ▆▆▆2871 was instructing DAVILLIER to set aside

13 $1,000 ("stack") to pay MAYFIELD for the cargo shipment containing marijuana received on May

14 26, 2014. I further believe that the user of ▆▆▆2871 was informing DAVILLIER that he

15 should have enough for one pound of marijuana, and that the user of ▆▆▆2871 had one pound

16 ("p") of loose, dried marijuana ("shake"), and is expecting one half-pound ("hp") one high potency

17 marijuana ("sour") to arrive on May 30, 2014.

18     120.   Set forth below are text message exchanges from MAYFIELD to DAVILLIER:

19     June 9, 2014: DAVILLIER and MAYFIELD

20     Ki (MAYFIELD):   My bad they said it won'tget there 330

21     Ki (MAYFIELD):   66127438

22     Ki (MAYFIELD):   My nigga just hit me he said its in route

23     Ki (MAYFIELD):   Let me check

24     Ki (MAYFIELD):   61151311

25     Ki (MAYFIELD):   Flt526

26     121.   I believe that in these text messages MAYFIELD was coordinating DAVILLIER's

27 receipt of the cargo shipment containing marijuana that was ultimately seized on June 9, 2014. I

28

1   believe this, in part, because the flight number and airbill number match the flight number and aribill

2   number of the seized shipment.

3       122.    According to a criminal history report for DAVILLIER, he was arrested in Alameda

4   County on October 17, 2011, for Possession of Marijuana for Sale and Sell/Furnish Marijuana in

5   violation of California Health & Safety Code Sections 11359 and 11360(A). Those charges were

6   dismissed on December 8, 2011. It also appears that DAVILLIER was convicted in Louisiana for

7   Produce, Manufacture, Distribute, Dispense, Possess a Schedule I Controlled Substance in 2011 and

8   sentenced to two years' probation.

9       123.    Following the seizure of the Southwest cargo shipment I reviewed records from

10  Southwest detailing MAYFIELD's use of Southwest Cargo. The information received included: (1)

11  the date of the shipment; (2) the description of the cargo shipped by MAYFIELD; (3) the originating

12  city; (4) the destination city; (5) the shipper; (6) the person who signed for or picked up the cargo;

13  and (7) the date the cargo was received. Set forth below is a chart summarizing the information:

| Date | Description | From | To | Shipper | Picked Up By | Received |
|---|---|---|---|---|---|---|
| 12/3/2013 | Wearing Apparel | Oakland | Raleigh Durham | Mayfield | CJameson | 12/3/2013 |
| 12/11/2013 | Wearing Apparel | Oakland | Little Rock | Mayfield | CJameson | 12/11/2013 |
| 12/19/2013 | Wearing Apparel | Oakland | Raleigh Durham | Mayfield | CJamerson | 12/19/2013 |
| 12/27/2013 | Wearing Apparel | Oakland | Little Rock | Mayfield | CJamerson | 12/27/2013 |
| 12/27/2013 | Electronic Equip. | Oakland | Philadelphia | Mayfield | JAustin | 12/27/2013 |
| 12/31/2013 | Artwork | Oakland | New Orleans | Mayfield | KWilson | 12/31/2013 |
| 1/7/2014 | Wearing Apparel | Oakland | New Orleans | Mayfield | KWilson | 1/7/2014 |
| 1/14/2014 | Wearing Apparel | Oakland | Little Rock | Mayfield | CJamerson (Session Listed as Recipient) | 1/14/2014 |
| 1/17/2014 | Wearing Apparel | Oakland | Atlanta | Mayfield | CJamerson | 1/17/2014 |
| 1/22/2014 | Wearing Apparel | Oakland | Charlotte | Mayfield | JWilliams | 1/22/2014 |
| 3/7/2014 | Wearing Apparel | Oakland | New Orleans | Mayfield | BDavillier | 3/7/2014 |
| 3/20/2014 | Artwork | Oakland | Columbus | Mayfield | BDavillier | 3/21/2014 |
| 3/20/2014 | Wearing Apparel | Oakland | New Orleans | Mayfield | JHart | 3/20/2014 |
| 3/30/2014 | Artwork | Oakland | Cleveland | Mayfield | MPorter | 3/31/2014 |
| 4/2/2014 | Wearing Apparel | Oakland | LaGuardia (NY) | Mayfield | BDavillier | 4/2/2014 |
| 4/2/2014 | Wearing Apparel | Oakland | LaGuardia (NY) | Mayfield | BDavillier | 4/2/2014 |
| 4/17/2014 | Wearing Apparel | Oakland | Dallas | Mayfield | BButler | 4/17/2014 |
| 5/3/2014 | Wearing Apparel | Oakland | New Orleans | Mayfield | BDavillier | 5/3/2014 |
| 5/6/2014 | Wearing Apparel | Oakland | Fort Lauderdale | Mayfield | AWomack | 5/6/2014 |
| 5/13/2014 | Artwork | Oakland | New Orleans | Mayfield | BDavillier | 5/13/2014 |
| 5/26/2014 | Wearing Apparel | Oakland | New Orleans | Mayfield | BDavillier | 5/26/2014 |
| 6/9/2014 | Wearing Apparel | Oakland | New Orleans | Mayfield | BDavillier | 6/9/2014 |

124.     I believe that each one of the shipments set forth above contained marijuana. JAMERSON picked up six shipments before he was arrested on February 10, 2014, and DAVILLIER picked up eight shipments, all after JAMERSON was arrested.  Following the seizure in New Orleans and arrest of DAVILLIER, it appears that MAYFIELD stopped using Southwest Cargo to ship marijuana.  If each shipment contained 11 kilograms of marijuana (just as the seized shipment from June 9 contained), the above shipments represent a total of 242 kilograms of marijuana in about a six-month period.  In addition, the chart shows other known co-conspirators picked up (or were intended to pick up) marijuana cargo shipments, including SESSION and JAMERSON, and that the TARGET SUBJECTS' DTO operates nationwide.  DAVILLIER was subsequently released.

**J.      December 8, 2014:  MAYFIELD Provides a Bag to Outbound Passenger CARRASCO in the Vestibule**

125.     I have learned the following based on a review of badge swipe data and surveillance video from the Airport.  On December 8, 2014, at 4:22 a.m., Cleveland-bound passenger Francisco Carrasco (CARRASCO) entered the Vestibule carrying a carrying a blue colored duffel bag.  At 4:38 a.m., MAYFIELD entered the AOA carrying a large black backpack.  At 4:42 a.m., MAYFIELD badged through the secure door to the Vestibule and handed the backpack to CARRASCO. MAYFIELD badged back through the security door at 4:43 a.m. and at 4:46 a.m. left the airport and was not carrying any bag.  CARRASCO stayed in the Vestibule until 5:21 a.m. when he left carrying the bag he came in with plus the large black backpack.

126.     According to Southwest flight records, CARRASCO also flew on Southwest on November 15, 2014 (to Dulles); December 19, 2014 (to Dulles); December 27, 2014 (to Cleveland); January 31, 2014 (Los Angeles); and February 4, 2014 (to Dulles).  Based in part on these flight records, as well as surveillance recordings (even though the exchanges are less clear and appear to involve bag swaps or MAYFIELD giving items to CARRASCO that he then put in his carry-on) and badge swipe data (which show MAYFIELD entering the Vestibule from the AOA early on the morning of these flights), that on each occasion listed above CARRASCO met with MAYFIELD in the Vestibule and MAYFIELD provided him with narcotics.

127.    Agents are conducting an ongoing financial investigation of CARRASCO. I have learned from IRS-CI SA Michael Hammond, however, that bank records show that CARRASCO and others involved with several business accounts at Wells Fargo have funneled at least $650,000 in cash from the East Coast to the West Coast where the money is withdrawn as cash. Agents have also seen a Maserati parked in CARRASCO's driveway in Hayward.

K.    **March 3, 2015: MAYFIELD Provides Baggage Containing Marijuana to Outbound Passenger WEST**

128.    At 4:50 a.m. on March 3, 2015, a Port security officer monitoring the Vestibule observed a woman enter the Vestibule carrying one piece of luggage but leave the Vestibule carrying two pieces of luggage. Deputy Cutonilli and another deputy approached the woman who identified herself as Sophia West (WEST). Deputy Cutonilli asked WEST how many bags she carried through security. She stated "one" and was asked why she now had two. WEST said that she received the bag from a man she knows as "Big Little Daddy." WEST gave consent for the deputies to search the bag. Inside the bag were thirteen packages containing what the Alameda County Crime Laboratory has determined to be 5.798 kilograms of marijuana.

129.    WEST was placed under arrest, advised of her Miranda rights, and questioned. WEST stated that she was flying to Anchorage, Alaska, via Seattle, Washington, on Alaska Airlines. WEST said she had previously flown with bags she received from Big Little Daddy to Atlanta, Columbus, and Anchorage. She said that on each occasion she received the bag in the "pay phone area" (the Vestibule) of Terminal 2 (the Southwest Terminal). WEST said she was paid $1,000 per trip. WEST was shown a photo-lineup which included MAYFIELD and asked if "Big Little Daddy" was in the photospread. WEST said that he was not. WEST consented to a search of her mobile phone, which was seized. Phone number ███████5585 was indexed in the Contacts section under "Big Lil Daddy" with a most recent contact time of 4:40 a.m. Badge swipe data shows that MAYFIELD swiped into the Vestibule at 4:43 a.m. and then badged out of the Vestibule and back to the AOA less than one minute later. I believe this is a telephone number used by MAYFIELD because he sent three videos of himself to WEST on February 25, 2015 from ███████5585 (the number for Big Lil Daddy).

**L.**   **Bank Account Activity of MILLHOUSE and AP**

130.   As previously stated in this affidavit, MILLHOUSE traveled with SESSION on their way to Little Rock when they were stopped in Phoenix and SESSION was arrested and marijuana seized. I believe that SESSION and MILLHOUSE are cousins and that their uncle is Donald HOLLAND. I also believe that HOLLAND's current or former girlfriend is AP. Based on financial records obtained during the financial investigation conducted in this case, I believe that drug trafficking proceeds from marijuana sold in Little Rock and the surrounding communities were funneled into the Bank of America accounts in the names of Ahshatae MILLHOUSE and AP for withdrawal and use by members of the DTO. Set forth below is a chart showing these cross-country deposits and withdrawals:

**Millhouse Account**

| Date | Amount | Transaction | Branch City |
|---|---|---|---|
| 5/16/2013 | $8,000 | Cash Deposit | Little Rock, Arkansas |
| 5/16/2013 | $8,000 | Cash Withdrawal | Hayward, California |
| 5/20/2013 | $8,000 | Cash Deposit | Little Rock, Arkansas |
| 5/20/2013 | $8,000 | Cash Withdrawal | Hayward, California |
| 5/30/2013 | $8,000 | Cash Deposit | Little Rock, Arkansas |
| 5/30/2013 | $8,000 | Cash Withdrawal | Hayward, California |
| 1/16/2014 | $9,000 | Cash Deposit | Little Rock, Arkansas |
| 1/16/2014 | $8,700 | Cash Withdrawal | Hayward, California |
| 2/3/2014 | $4,500 | Cash Deposit | Little Rock, Arkansas |
| 2/3/2014 | $4,500 | Cash Deposit | Little Rock, Arkansas |
| 2/3/2014 | $8,000 | Cash Withdrawal | Hayward, California |

131.   I have reviewed a bank surveillance video image for the January 16, 2014, cash deposit made into the MILLHOUSE account in Arkansas. The video depicts Laticia MORRIS depositing cash into MILLHOUSE's account and is therefore the depositor in the chart above on January 16, 2014.

132.   In addition, a text message exchange found during the search of one of SESSION's phones that were seized from him on February 10, 2014, revealed a text message exchange with the unidentified user of telephone number ████0781. One of those exchanges appears to relate to the transactions above:

January 31, 2014, from 6:19 a.m. to 7:02 a.m.

SESSION:            ████3034

SESSION:            ████3034 hit me

February 3, 2014, from 8:26 a.m. to 10:48 a.m.

(305) 205-0781:      X-4245 ahshatae millhouse

SESSION:            Ok

(305) 205-0781:      ██████████94505

133.    MILLHOUSE's account number (abbreviated as X-4245 but set forth in full in the original text) set forth in the chart above is the same number that the individual using ████0781 texted to SESSION on February 3, 2014. As seen above, two separate cash deposits were made into that account from Little Rock, Arkansas. The same person who texted MILLHOUSE's account number to SESSION then texted the home address of Donald HOLLAND in Discovery Bay to SESSION. I believe that the user of telephone number ████0781 is Donald HOLLAND and that he was directing SESSION to deposit narcotics trafficking proceeds into MILLHOUSE's account for withdrawal and giving him his home address (which did not include the city, most likely because SESSION already knew that HOLLAND lives in Discovery Bay).

134.    From 2012 to March 2014, over $140,000 in cash was deposited into Bank of America accounts held by AP, HOLLAND'S current or former girlfriend. In addition, although AP appears to reside in California, larger cash deposits were made by known and unknown individuals in Arkansas, where the much of the marijuana transported by the DTO in this investigation was shipped. Once the funds were deposited, the same funds were withdrawn at several different banking centers in California on the same day, or nearly the same day, as the deposit.

135.    As shown in the chart below, from August 19, 2013, through January 16, 2014, $50,300 in cash was deposited in Arkansas and $50,250 in cash was withdrawn in California. Bank surveillance video for a number of the cash deposits and withdrawals into and out of AP's account has been obtained. The name of the depositor or withdrawer, if known, is listed where video is available:

**AP Account**

| Date | Amount | Transaction | Depositor/Withdrawer | Branch City |
|---|---|---|---|---|
| 8/19/2013 | $8,500 | Cash Deposit | --- | Little Rock, Arkansas |
| 8/19/2013 | $8,500 | Cash Withdrawal | | Richmond, California |
| 9/23/2013 | $3,000 | Cash Deposit | --- | Little Rock, Arkansas |
| 9/23/2013 | $3,000 | Cash Withdrawal | | Richmond, California |
| 10/9/2013 | $5,000 | Cash Deposit | --- | Little Rock, Arkansas |
| 10/9/2013 | $5,000 | Cash Withdrawal | | Richmond, California |
| 10/15/2013 | $5,000 | Cash Deposit | --- | Little Rock, Arkansas |
| 10/15/2013 | $5,000 | Cash Withdrawal | | Danville, California |
| 10/19/2013 | $6,000 | Cash Deposit | Major Session | Little Rock, Arkansas |
| 10/19/2013 | $6,000 | Cash Withdrawal | | Richmond, California |
| 10/30/2013 | $5,500 | Cash Deposit | --- | Little Rock, Arkansas |
| 10/30/2013 | $5,400 | Cash Withdrawal | Unknown Female | Richmond, California |
| 12/26/2013 | $3,300 | Cash Deposit | --- | Little Rock, Arkansas |
| 12/26/2013 | $3,300 | Cash Withdrawal | AP | Richmond, California |
| 12/28/2013 | $3,500 | Cash Deposit | Unknown Male | Little Rock, Arkansas |
| 12/28/2013 | $2,500 | Cash Deposit | --- | Little Rock, Arkansas |
| 12/30/2013 | $6,000 | Cash Withdrawal | | El Cerrito, California |
| 1/16/2014 | $8,000 | Cash Deposit | Laticia Morris | Little Rock, Arkansas |
| 1/16/2014 | $8,000 | Cash Withdrawal | AP | Richmond, California |

136.    As shown in the charts above in paragraphs 130 and 135, and as shown in bank surveillance video, on January 16, 2014, MORRIS (wearing the same clothing) went to two different Bank of America branches to make cash deposits totaling $17,000 into the accounts of MILLHOUSE (as shown in paragraph 130) and AP (as shown in paragraph 135). At 12:40 p.m., MORRIS deposited $9,000 in cash into MILLHOUSE's account at the Downtown Little Rock branch. At 12:58 p.m., MORRIS deposited $8,000 in cash into AP's account at the Main Little Rock branch. I believe that MORRIS was depositing money into MILLHOUSE's account and into AP's account for HOLLAND, SESSION, and/or other members of the DTO. I know that one of AP's Bank of America accounts has received regular deposits from the Social Security Administration for HOLLAND's children. I believe this demonstrates that AP allows HOLLAND to use her accounts.

M.    **Donald HOLLAND's Involvement in the Drug Trafficking Conspiracy**

1.    **1999 Arrest of HOLLAND's Former Girlfriend in Arizona with Cocaine**

137.    On January 23, 1999, a woman was arrested at the Tucson Airport with a firearm in her carry-on and over two pounds of cocaine hidden in her clothing. She was the mother of some of

1  HOLLAND's children and had a ticket to Las Vegas and a second ticket from Las Vegas to Oakland.

2  I believe she was most likely traveling to meet HOLLAND in Las Vegas where HOLLAND would

3  take the cocaine for further distribution, or traveling on to Oakland for the same purpose. On January

4  10, 2004, she was murdered with an axe in Tucson, Arizona.

   **2.  2006 Purchase of a Bentley Luxury Automobile by HOLLAND**

6  138.  According to financial records provided by Redwood Credit Union (RCU), on August

7  10, 2006, HOLLAND purchased a used Bentley Flying Spur luxury automobile. The documents

8  show the purchase price of the vehicle was $177,084.59. HOLLAND made a down payment of

9  $25,000 and financed the remainder through RCU. On his loan application, he listed his

10 "Occupation/Employer" as "Inv./ACC Exec. A&L Investments" in Lathrop, California. This

11 company, however, does not appear to exist at that address. Furthermore, based on the information I

12 have learned through this investigation, I do not believe that HOLLAND is, in fact, an investment

13 advisor or accountant. Instead, I believe that HOLLAND's primary, if not sole, source of income is

14 narcotics trafficking.

   **3.  2009 Arrest of HOLLAND with Two Kilograms of Cocaine**

16 139.  I have reviewed a report of HOLLAND's arrest on January 21, 2009 and some details

17 from that report are set forth below. On January 21, 2009, a police officer conducted a traffic stop of

18 HOLLAND and discovered two kilograms of cocaine hidden in a dashboard secret compartment and

19 $1,520 in cash in HOLLAND's front pocket. Police subsequently obtained a warrant to search

20 HOLLAND's residence in Stockton, California. AP was inside the residence at the time of the

21 search, along with some of HOLLAND's children. On November 13, 2009, HOLLAND was

22 convicted of Possess/Purchase for Sale a Narcotic Controlled Substance in violation of California

23 Health & Safety Code Section 11351. HOLLAND was sentenced to 7 years of probation (and, in

24 fact, is currently on probation with a four-way search clause). I believe the circumstances

25 surrounding this arrest demonstrate not only that HOLLAND is a sophisticated narcotics trafficker,

26 but also, that AP is aware of HOLLAND's narcotics trafficking activities.

27

28

### 4. 2012 Notice of Forfeiture of Bentley Automobile

140.    I have reviewed a document provided by RCU that it received on June 28, 2012, from the Las Vegas Metropolitan Police Department (LVMPD). The document is a notice to RCU as lienholder that on June 25, 2012, the 2006 Bentley Flying Spur purchased by HOLLAND in 2006 was being used to transport marijuana in violation of the statute criminalizing the possession of marijuana with intent to sell. I have not, however, been able to obtain any LVMPD report regarding the noticed seizure.

### 5. 2012 Through 2014 Use of MetaBank by HOLLAND

141.    I have learned that HOLLAND uses MetaBank as his financial institution. MetaBank provides its customers with reloadable stored value cards. From 2012 to April 2014, HOLLAND loaded over $33,000 in cash onto his account and spent those funds shortly after loading them onto his card. This activity is consistent with a drug trafficker attempting to conceal the source of his income, and is not consistent with the financial activities one would expect from a legitimate accountant or investment advisor.

### 6. 2013 Trip to Miami with MAYFIELD, SESSION, and WATKINS

142.    I have previously obtained search warrants for e-mail accounts used by HOLLAND; AP; MAYFIELD; and an individual named Jibri Omar Watkins (WATKINS). Based on a review of numerous e-mails from these accounts, I believe that HOLLAND and others flew to Miami and rented a mansion to celebrate HOLLAND's fortieth birthday (on April 1, 2013). Details of those e-mails and this trip are set forth below.

143.    On January 29, 2013, WATKINS sent a series of e-mails with photographs and other information related to a mansion for rent in Florida. HOLLAND forwarded these e-mails to AP. According to e-mails to HOLLAND from American Airlines and records from MetaBank, a Visa-branded MetaBank card in Donald HOLLAND's name was used to purchase round-trip airfare for HOLLAND and two other individuals from SFO to Fort Lauderdale on Flight 529 departing SFO on March 29, 2013, and returning on April 2, 2013. HOLLAND eventually upgraded his ticket to first class and the total purchase price for all three tickets was $2,325.80. According to e-mails from cheaptickets.com, MAYFIELD used a Visa credit card to purchase tickets for himself and WATKINS

1    on JetBlue from San Francisco to Fort Lauderdale departing on March 28, 2013. The total purchase

2    price was $1,207.78. On March 29, 2013, SESSION flew from Little Rock to Fort Lauderdale on

3    then flew back to Little Rock on April 2, 2013.

4         144.    HOLLAND e-mailed photographs from the Miami trip to AP. The photographs show

5    multiple luxury automobiles parked in the driveway of the mansion, numerous photographs of the

6    mansion's accommodations, and one photograph of twelve men standing in a large room with a very

7    large bottle of champagne posing for a photograph. HOLLAND is at the forefront of the group.

8    Standing with HOLLAND are MAYFIELD, WATKINS, and SESSION.

9         **7.    2013 Travel to Little Rock by HOLLAND**

10        145.    On November 20, 2013, HOLLAND flew on Southwest from Oakland to Las Vegas to

11   Little Rock. On November 22, 2013, HOLLAND flew from Little Rock to Dallas to Las Vegas. On

12   November 24, 2013, HOLLAND flew from Las Vegas to Oakland on Southwest. I believe

13   HOLLAND flew to Little Rock for the purpose of committing the TARGET OFFENSES.

14        **8.    2014 Purchase of Chevrolet Tahoe SUV by HOLLAND**

15        146.    According to loan documents, on March 31, 2014, HOLLAND obtained a vehicle loan

16   for an SUV from SafeAmerica Credit Union. In his loan application, HOLLAND claimed that he had

17   been employed as an accountant ███████████████████████

18   ████████████████ for two years and eight months. He further claimed that he earned

19   $140,000 per year. Despite multiple surveillances of HOLLAND, Agents have not observed

20   HOLLAND at ████   In addition, California EDD records show no reported wages for HOLLAND

21   for 2012 and 2013. Based on my knowledge of this investigation, I do not believe HOLLAND

22   provides accounting services to ████. Instead, I believe HOLLAND is either claiming to work as an

23   accountant for ████ without its knowledge or that HOLLAND is compensating ████ for falsely

24   confirming his representation that he provides them with accounting services.

25        **9.    Trash Searches Conducted at HOLLAND's Residence in Discovery Bay**

26        147.    Multiple trash searches have been conducted by at HOLLAND's residence at ████

27   ████████ Discovery Bay, California. Set forth below are some of the items and the dates

28   they were recovered.

<u>May 1, 2014</u>

148.    Two business cards bearing HOLLAND's name as well as an envelope addressed to HOLLAND from M. Winn, Probation Department, County of Alameda, were recovered from the trash. I believe this shows that at least some of the trash being generated at the residence is generated by HOLLAND. In addition, handwritten items appear to be in the same handwriting as other handwriting samples believed to be created by HOLLAND.

149.    Also in the trash were five pieces of spiral notebook paper containing what appears to be a "to-do" list written by HOLLAND. One of the pages lists the following items:

Court Probation Hearing

Baggage Compensation

Buy Car

Walk Thru – Electricity – Equipment

Gameplan with "K"

Trip to Tex & AR

12 month Game Plan Investments, Assets, Debt

Taxes – Credit

Corp Set Up

Mini Crew

Game Plan –Blk + Hedda

150.    I believe that "Court Probation Hearing" is a reference to HOLLAND's Probation appointment with ACPD Deputy Winn on April 16, 2014. As discussed in greater detail below, FBI surveillance agents observed HOLLAND leave the probation appointment and go to 2558 San Pablo Avenue, Oakland, California. On October 24, 2014, I obtained a federal search warrant for that location. Inside the location was an indoor marijuana grow with over 600 plants. Jibri WATKINS was inside the marijuana grow at the time of the search warrant (as well as others) and I believe WATKINS was responsible for managing the grow.

151.    I believe that "Baggage Compensation" may refer to HOLLAND being paid back for the purchase of the backpacks used to smuggle the marijuana through the airport and the loss of some

1  of those backpacks. I believe that "Walk Thru – Electricity – Equipment" is in reference to indoor

2  marijuana growing operations. I believe that "Gameplan with K" is a reference to conspiring with

3  MAYFIELD regarding the airport drug smuggling operation. I believe that "Trip to Tex & AR" is a

4  reference to HOLLAND's travel to the states of Texas and Arkansas, specifically to Little Rock,

5  Arkansas, for the purpose of committing the TARGET OFFENSES.

6      152.    Another page from the spiral notebook has handwritten notes listing "Vacation and

7  Travel," "New York," "Miami," and Disneyland. On this same page is a handwritten telephone

8  number ▮▮▮▮▮8057. This is MORRIS' telephone number, the same one that sent a text message

9  to SESSION when he was arrested in Little Rock on February 10 that said, "Don trynna call u."

10      153.    Another page from the spiral notebook appears to have more "to-do" items, including

11  "Grow." I believe that "Grow" is a reference to indoor marijuana growing operations, possibly the

12  same grow or grows that I believe were managed on-site by WATKINS.

13      154.    Also recovered from the trash on this date was another apparent "to-do" list, with an

14  entry reading "Michelle" written above the telephone number ▮▮▮▮▮1551. On February 12,

15  2014, this number (without the area code) was written on a United States Postal Service Money Order

16  sent by HOLLAND from Little Rock, Arkansas on February 12, 2014. In addition, this same number

17  is saved in the contact lists of two of the telephones seized from SESSION in Little Rock, Arkansas

18  on February 10, 2014. In one of the seized devices this number is indexed as "Machelle," while in

19  another it is indexed with no name.

20  **May 14, 2014**

21      155.    Multiple names were written on a piece of paper recovered from the trash on this date.

22  One of the names is "Jabre." The word "security" is written and underlined, and underneath it the

23  names "Major" and "D" are written. On this same sheet of paper the dates "March 29-April 2" are

24  written. I believe that the dates written on this handwritten note represent the dates that HOLLAND

25  traveled to Miami and that "Major" is a reference to SESSION, and "Jabre" is a reference to Jibri

26  WATKINS. Also recovered from the trash at HOLLAND's residence on May 14, 2014, was a torn

27  scrap of paper with a handwritten phone number ▮▮▮▮▮3034

28

156.    As discussed previously, on January 31, 2014, SESSION texted telephone number ███ 3034 to the user of ███ 0781. On February 3, 2014, I believe HOLLAND used ███ 0781 to text the account number for MILLHOUSE to SESSION, as well as his home address in Discovery Bay. Other than the area code (which I believe may be a mistake), the number written in HOLLAND's trash and the number that texted SESSION are identical.

<u>October 1, 2014</u>

157.    One of the documents recovered from the trash on October 1, 2014, was a United States Postal Service Money Order receipt dated February 12, 2014, in the amount of $1,000.00, with serial number 21776708790. Handwritten in the "pay-to" section of the receipt are the numbers ██ 1551 (this is the same number that was handwritten on trash recovered on May 1 and indexed in SESSIONS's phones). USPIS provided the FBI with a copy of the money order.

158.    The money order was made payable to the same person who, according to public records, is the owner of ███ Discovery Bay (HOLLAND's residence). The money order was processed on March 5, 2014. In the 'from' section, the name "Donald Holland" is written in what appears to be HOLLAND's handwriting. In the 'memo' section, the word "rent" is also written in handwriting similar to HOLLAND's. According to the USPIS the transaction was made from the Archer Station Post Office located at 7401 Colonel Glenn Road, Little Rock, Arkansas. This was a cash transaction, for a total amount due of $1,001.65, and the tender amount was $1,002.00. Based on this information, I believe that HOLLAND traveled to Little Rock after the arrest of JAMERSON, SESSION, and BAKER, and while he was there he paid his rent with a money order funded by cash that constituted the proceeds of narcotics trafficking.

**10.    April 16, 2014 Surveillance of HOLLAND to Marijuana Grow**

159.    On April 16, 2014, Agents conducted surveillance of HOLLAND as he left his appointment with the ACPD. At 9:34 a.m., HOLLAND drove in his SUV with paper plates to various locations in Oakland including a Wells Fargo Bank, a Money Mart Payday Loans store, a California Check Cashing store, a market, and a UPS Store. At 12:37 p.m., HOLLAND parked his vehicle and walked to the building located at 2558 San Pablo Avenue, Oakland, California. As

1 previously mentioned, this location was the site of a 600-plant marijuana grow that I believe was

2 managed on-site by WATKINS.

3     160. During the execution of the search warrant at 2558 San Pablo, an Apple iPhone was

4 seized from WATKINS and later searched pursuant to a federal search warrant. The following chart

5 summarizes some of the telephone numbers and corresponding contact names that were listed in

6 WATKINS' contacts section along with the person I believe, based on my knowledge of this

7 investigation, has actually used, or uses, that telephone number:

| Telephone Number | Contact Name | Known User |
|---|---|---|
| ████3764 | JR | FLEMING |
| ████8002 | K | MAYFIELD |
| ████5414 | Buddy Pass | MAYFIELD |
| ████8859 | K Folks | MAYFIELD |
| ████4326 | Cuzz Don | HOLLAND |
| ████1454 | Cousin Don | HOLLAND |
| ████8016 | Cuzz Major | SESSION |
| ████0648 | Kirby | ████ |

18     161. As mentioned earlier in this affidavit, telephone number ████8859 (indexed in

19 WATKINS' phone as "K Folks") was also indexed in the contacts section of DAVILLIER's phone as

20 "Ki." In addition, numerous photographs were found on WATKINS's iPhone, including photographs

21 of WATKINS and FLEMING. I also believe that, based on business records and other information,

22 the marijuana grow at 2558 San Pablo was in operation when HOLLAND went there in April 2014.

23 ██████████████████████████████████████████

24 ██████████████████████████████████████████

25 ██████████████████████████████████████████

26 ██████████████████████████████████████████

27 ██████████████████████████████████████████

28

1

2

3

4

5

6

7

8                                                                                                    ol

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



24          165.    I have reviewed a criminal history report for HOLLAND which shows that he has

25   previously been convicted of: (1) Transport/Sale of a Narcotic Controlled Substance, in violation of

26   California Health & Safety Code Section 11352, in Alameda County Superior Court, on or about May

27   3, 1993; and (2) Use/Etc. Fake Compartment for Controlled Substance, Possess/Purchase Controlled

28   Substance for Sale, and Transport/Sale Controlled Substance, in violation of California Health &

1  Safety Code Sections 11366.8, 11351, and 11352, in Alameda County Superior Court, on or about

2  November 13, 2009.

3

4

5      **N.    Money Laundering Activities by MAYFIELD**

6      167.    IRS-CI SA Michael Hammond has reviewed bank account records for

7  Southwest baggage handlers Keith MAYFIELD          . According to SA Hammond, these records

8  show activity consistent with money laundering. According to SA Hammond, it is illegal to

9  knowingly and willfully structure a transaction to evade, among other, recordkeeping requirements

10  pursuant to 31 U.S.C. § 5324(a). In addition, under 18 U.S.C. § 1956(a)(1), it is a crime to conduct

11  financial transactions with the proceeds of a specified unlawful activity, such as drug trafficking,

12  knowing that the transactions were designed in whole and in part to conceal and disguise the nature,

13  the location, the source, the ownership, and the control of the proceeds of specified unlawful activity

14  and to avoid a transaction reporting requirement under federal law, and knowing that the property

15  involved in the financial transactions represented the proceeds of some form of unlawful activity.

16  Under 18 U.S.C. §1957, it is a crime to knowingly engage in a monetary transaction with such

17  proceeds in excess of $10,000.

18          **1.    Keith Mayfield Account Activity**

19      168.    SA Hammond has examined records from Chase Bank accounts in MAYFIELD's

20  name that indicate an unusual pattern of paired cash deposits and withdrawals that may be a

21  mechanism for transmitting drug proceeds. The following are examples of these transactions:

22

| Date | Amount | Transaction | Branch City |
|------|--------|-------------|-------------|
| 7/2/2012 | $3,600 | Cash Deposit | Dallas, TX |
| 7/6/2012 | $2,000 | Cash Withdrawal | San Leandro, CA |
| 8/20/2012 | $1,900 | Cash Deposit | Dallas, TX |
| 8/20/2012 | $500 | Cash Withdrawal | San Leandro, CA |
| 8/21/2012 | $500 | Cash Withdrawal | San Leandro, CA |
| 9/7/2012 | $1,000 | Cash Deposit | Houston, TX |
| 9/10/2012 | $800 | Cash Withdrawal | San Leandro, CA |
| 1/10/2013 | $11,100 | Cash Deposit | Dallas, TX |

| | | | |
|---|---|---|---|
| 1/10/2013 | $6,000 | Cash Withdrawal | Hayward, CA |
| 1/14/2013 | $3,366 | Cash Withdrawal | San Leandro, CA |
| 1/29/2013 | $5,400 | Cash Deposit | Dallas, TX |
| 1/29/2013 | $2,300 | Cash Withdrawal | San Leandro, CA |
| 1/31/2013 | $4,000 | Cash Withdrawal | San Leandro, CA |
| 2/4/2013 | $2,700 | Cash Deposit | Dallas, TX |
| 2/11/2013 | $5,900 | Cash Deposit | Dallas, TX |
| 2/11/2013 | $4,000 | Cash Withdrawal | San Leandro, CA |
| 2/12/2013 | $8,700 | Cash Deposit | Dallas, TX |
| 2/12/2013 | $7,000 | Cash Withdrawal | San Leandro, CA |
| 2/21/2013 | $1,500 | Cash Withdrawal | San Leandro, CA |
| 2/21/2013 | $1,500 | Cash Withdrawal | San Leandro, CA |
| 2/22/2013 | $800 | Cash Withdrawal | San Leandro, CA |
| 2/25/2013 | $8,200 | Cash Deposit | Dallas, TX |
| 2/25/2013 | $4,400 | Cash Withdrawal | San Leandro, CA |
| 2/25/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 3/4/2013 | $7,200 | Cash Deposit | Dallas, TX |
| 3/5/2013 | $6,000 | Cash Withdrawal | San Leandro, CA |
| 3/18/2013 | $6,000 | Cash Deposit | Dallas, TX |
| 3/19/2013 | $6,000 | Cash Withdrawal | San Leandro, CA |
| 3/28/2013 | $6,000 | Cash Deposit | Dallas, TX |
| 3/28/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 4/1/2013 | $6,000 | Cash Deposit | Dallas, TX |
| 4/3/2013 | $5,500 | Cash Deposit | Dallas, TX |
| 4/3/2013 | $8,000 | Cash Withdrawal | San Leandro, CA |
| 4/10/2013 | $5,000 | Cash Deposit | Dallas, TX |
| 4/12/2013 | $5,000 | Cash Deposit | Dallas, TX |
| 4/18/2013 | $9,000 | Cash Withdrawal | San Leandro, CA |
| 4/18/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 4/22/2013 | $4,000 | Cash Deposit | Dallas, TX |
| 4/22/2013 | $5,400 | Cash Withdrawal | Hayward, CA |
| 4/24/2013 | $3,900 | Cash Deposit | Dallas, TX |
| 5/2/2013 | $500 | Cash Withdrawal | Hayward, CA |
| 5/6/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 5/11/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 5/13/2013 | $3,000 | Cash Deposit | Dallas, TX |
| 5/13/2013 | $2,000 | Cash Withdrawal | San Leandro, CA |
| 5/14/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 5/20/2013 | $6,400 | Cash Deposit | Dallas, TX |
| 5/21/2013 | $6,000 | Cash Withdrawal | Hayward, CA |

| | | | |
|---|---|---|---|
| 6/8/2013 | $3,000 | Cash Deposit | Garland, TX |
| 6/8/2013 | $2,000 | Cash Withdrawal | San Leandro, CA |
| 6/10/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 6/17/2013 | $200 | Cash Withdrawal | San Leandro, CA |
| 6/24/2013 | $3,500 | Cash/Money Orders Deposit | Dallas, TX |
| 6/24/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 6/25/2013 | $2,000 | Cash Withdrawal | San Leandro, CA |
| 7/1/2013 | $2,000 | Cash Deposit | Dallas, TX |
| 7/1/2013 | $100 | Cash Withdrawal | San Leandro, CA |
| 7/1/2013 | $500 | Cash Withdrawal | San Leandro, CA |
| 7/2/2013 | $500 | Cash Withdrawal | Hayward, CA |
| 7/8/2013 | $300 | Cash Withdrawal | San Leandro, CA |
| 7/8/2013 | $1,800 | Cash Deposit | Sacramento, CA |
| 7/9/2013 | $800 | Cash Withdrawal | San Leandro, CA |
| 7/10/2013 | $300 | Cash Withdrawal | Oakland, CA |
| 7/22/2013 | $3,700 | Cash Deposit | Dallas, TX |
| 7/22/2013 | $500 | Cash Withdrawal | Oakland, CA |
| 7/22/2013 | $2,500 | Cash Withdrawal | San Leandro, CA |
| 7/29/2013 | $900 | Cash Deposit | Dallas, TX |
| 7/29/2013 | $100 | Cash Withdrawal | San Leandro, CA |
| 7/29/2013 | $400 | Cash Withdrawal | San Leandro, CA |
| 7/29/2013 | $300 | Cash Withdrawal | Hayward, CA |
| 8/12/2013 | $1,500 | Cash Deposit | Lancaster, TX |
| 8/12/2013 | $200 | Cash Withdrawal | San Leandro, CA |
| 8/13/2013 | $1,200 | Cash Withdrawal | San Leandro, CA |

169. According to SA Hammond, these cash transactions were in even amounts, all but one transaction was under $10,000, and they were frequent. There does not appear to be a legitimate explanation for a pattern of matching cash deposits and withdrawals. This may be a means of moving money without the risks of detection, seizure, or theft associated with physically carrying cash. Customers or associates can deposit cash into the account from any location, and MAYFIELD can have the money withdrawn at the location of his choosing, or more specifically, close to his work or residence. In fact, the locations of all of the deposits except one were in Texas. All of the withdrawals were in the Oakland metropolitan area, which is consistent with the accounts being used as vehicles for transmitting cash to MAYFIELD, who resides in this metropolitan area. From July

55

2012, through August 2013, the total cash deposits outside of the Oakland metropolitan area was
$122,900.  The total related cash withdrawals in the Oakland metropolitan area was $97,466.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26    ///
27    ///
28    ///
```

### 3. Kenneth Fleming Account Activity

172.   SA Hammond has examined records from a Wells Fargo account in FLEMING's name that indicates an unusual pattern of paired cash deposits and withdrawals that may be a mechanism for transmitting drug proceeds.  The following are examples of these transactions:

| Date | Amount | Transaction | Branch City |
|------|--------|-------------|-------------|
| 3/1/2013 | $3,800 | Cash Deposit | McKinney, TX |
| 3/5/2013 | $3,600 | Cash Deposit | Allen, TX |
| 3/5/2013 | $5,000 | Cash Withdrawal | Castro Valley, CA |
| 3/6/2013 | $250 | Cash Deposit | Atlanta, GA |
| 3/6/2013 | $500 | Cash Withdrawal | Oakland, CA |
| 4/8/2013 | $5,600 | Cash Deposit | McKinney, TX |
| 4/8/2013 | $5,000 | Cash Withdrawal | Oakland, CA |
| 4/22/2013 | $2,900 | Cash Deposit | Dallas, TX |
| 4/23/2013 | $5,000 | Cash Deposit | Dallas, TX |
| 4/23/2013 | $5,000 | Cash Withdrawal | Oakland, CA |
| 6/15/2013 | $5,600 | Cash Deposit | McKinney, TX |
| 6/15/2013 | $5,000 | Cash Withdrawal | San Lorenzo, CA |
| 10/28/2013 | $8,200 | Cash Deposit | McKinney, TX |
| 10/29/2013 | $8,100 | Cash Withdrawal | San Leandro, CA |
| 11/20/2013 | $8,200 | Cash Deposit | McKinney, TX |
| 11/22/2013 | $8,100 | Cash Withdrawal | San Leandro, CA |
| 12/13/2013 | $4,000 | Cash Deposit | McKinney, TX |
| 12/13/2013 | $4,500 | Cash Deposit | McKinney, TX |
| 12/17/2013 | $8,100 | Cash Withdrawal | San Leandro, CA |

173.   According to SA Hammond, these cash transactions were in even amounts, all transaction were under $10,000, and they were frequent. There does not appear to be a legitimate explanation for a pattern of matching cash deposits and withdrawals.  This may be a means of moving

1    money without the risks of detection, seizure, or theft associated with physically carrying cash.

2    Customers or associates can deposit cash into the account from any location, and FLEMING can have

3    the money withdrawn at the location of his choosing, or more specifically, close to his work or

4    residence. In fact, the locations of all of the deposits were in Texas (McKinney in particular) and

5    Georgia. All of the withdrawals were in the Oakland metropolitan area, which is consistent with the

6    accounts being used as vehicles for transmitting cash to FLEMING, who resides in this metropolitan

7    area. From March 2013, through December 2013, the total cash deposits outside of the Oakland

8    metropolitan area was $51,650. The total related cash withdrawals in the Oakland metropolitan area

9    was $44,800.



176.    Based on the information provided by SA Hammond, I believe that MAYFIELD, FLEMING      laundered narcotics trafficking proceeds through their various bank accounts. I believe that they are either continuing to launder drug trafficking proceeds through accounts I am not currently aware of (and thus records of these transactions will be found in their residences), or, they are no longer laundering drug trafficking proceeds through their accounts but evidence (in the form of physical or electronic records) of their past commission of the TARGET OFFENSES will still be found in their residences.

61

## V.   KNOWLEDGE, TRAINING, AND EXPERIENCE REGARDING NARCOTICS

###   TRAFFICKING

177.    Based on my training, experience, conversations with other experienced narcotics investigators, and my knowledge of this investigation, I know the following regarding the practices of narcotics traffickers.

178.    It is common for dealers of controlled substances to have controlled substances that are packaged for sale in the place where they live or sell from, in their vehicles, or on their persons. Individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug dealing in their residences and businesses, or the residences of friends or relatives, the locations used to facilitate their narcotics trafficking, and in surrounding areas to which they have ready access such as garages, car ports and outbuildings. They also conceal evidence in vehicles, including vehicles outside their residences or in the vicinity of their drug distribution locations, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences and businesses. In addition, and in this case in particular, evidence has established that the co-conspirators involved in this investigation utilize vehicles registered in other people's names.

179.    Evidence also may be found in other areas to which a narcotics trafficker has ready access, such as rented storage areas and safety deposit boxes. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for manufacturing, weighing, packaging, and distributing drugs, other contraband, records and evidence of drug transactions, proceeds from sales of drugs, and assets purchased with the proceeds of narcotics trafficking.

180.    Individuals involved in illegal trafficking of narcotics commonly use certain equipment and paraphernalia to manufacture, weigh, package, and prepare controlled substances for distribution. The paraphernalia includes packing materials (such as plastic baggies, balloons, wrapping paper, cellophane, condoms, and film canisters), scales to weigh controlled substances, and cutting agents and dilutants to stretch the quantity of the controlled substance so narcotics traffickers can increase their product amount and increase profit. Narcotics traffickers commonly store these

1   items on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in

2   their businesses, in the residences of friends or relatives, in abandoned residences near their drug

3   distribution locations, in their vehicles, and in other areas to which they have ready access.

4       181.   Narcotics traffickers often maintain records of their transactions in a manner similar to

5   the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary

6   records often remain for long periods of time, sometimes years, to memorialize and record past

7   transactions, the status of monies owed and received, and the names and telephone numbers of

8   suppliers, customers, and co-conspirators.  These records can be maintained on paper, in the form of

9   business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's,

10  miscellaneous notes, money orders, customer lists, and telephone address books.

11      182.   These records described above often reflect names, addresses and/or telephone

12  numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer

13  lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his

14  suppliers.  Records often indicate locations and distribution points of controlled substances, and the

15  purchase of materials, supplies and articles used by the trafficker, and by co-conspirators in the

16  distribution of controlled substances.  Records frequently include the identification of properties such

17  as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker

18  and his co-conspirators in the distribution of controlled substances.  These records include property

19  rental and ownership records such as deeds of trusts and lease and purchase agreements, and vehicle

20  registration, rental, and ownership information.  These records are stored by narcotics traffickers on

21  their person or in their businesses, residences and surrounding garages, outbuildings, carports, and

22  yards, the residences of friends or relatives, and vehicles.

23      183.   The records described above also can exist in electronic form on computers and

24  mobile electronic devices.  Further, data that is processed by an electronic device may be written to

25  the computer hard drive or other storage medium even if the user does not intentionally save the

26  information.  For example, a computer operating system may take random data out of working

27  memory and use it to files on a computer hard drive during the storage process.  Electronic

28  information can remain on computer storage media, such as hard drives, for an indefinite period of

1   time. Even when a computer user attempts to delete records from a computer storage medium, the

2   records may still exist and be recovered through computer forensic techniques.

3        184.    Narcotics traffickers often travel to facilitate their trafficking. Evidence of travel by

4   persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts related to

5   travel such as car-rental receipts, fuel receipts, and hotel receipts, and passports and visas and their

6   contents. These items are stored by drug dealers on their person or in their businesses, residences and

7   surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

8        185.    Narcotics traffickers often use storage facilities for drugs and other items related to

9   trafficking that are at a location away from their residences and businesses. These off-site storage

10   facilities are often commercial storage lockers and rooms. These locations are often used to store or

11   hide drugs, contraband, money, and other valuables. Narcotics traffickers often keep documents and

12   other items tending to show the existence of other stored drugs, contraband, money, and other

13   valuables in areas such as storage. Those documents and other items include rental agreements,

14   receipts, keys, notes, and maps specifically concerning off-site storage rooms, lockers, and safety

15   deposit boxes. This evidence may be found on their person or in their businesses, residences and

16   surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and

17   vehicles. Narcotics traffickers also often conceal evidence of drug dealing in vehicles outside their

18   residences for ready access and to prevent detection and seizure by officers executing search warrants

19   at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes

20   controlled substances, indicia such as packaging, documents and electronic storage devices (and their

21   contents) evidence tending to show the distribution of narcotics (such as IOU's, pay-owe sheets,

22   ledgers, lists of names and phone numbers, telephone address books, *etc.*), digital pagers (and their

23   contents), mobile telephones and portable electronic devices (and their contents), and counter-

24   surveillance devices.

25        186.    Other evidence of transportation, ordering, possession, and sale of drugs can include

26   the following: telephone bills to show the numbers called by the drug dealers (and hence potential

27   associates), overnight mail receipts, bank statements, deposits and withdrawal slips, savings books,

28   investment statements, loan statements, other financial institution statements, and federal and state tax

1  returns.  The above items are stored by narcotics traffickers on their person or in their businesses,

2  residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or

3  relatives, and vehicles.

4      187.    Narcotics traffickers usually sell their products for cash.  Because multi-pound

5  quantities of marijuana can be sold for thousands of dollars, dealers typically have hundreds of

6  dollars in cash on hand both as proceeds of sales and to purchase their own supplies.  In addition,

7  drug dealers often have other assets generated by their drug business, or purchased with cash earned,

8  such as precious metals and stones, jewelry, real estate, vehicles, electronic equipment, computers,

9  and other valuables.

10     188.    Evidence of significant, unexplained income of narcotics traffickers, or of the

11  acquisition and concealment of money and assets from drug sales, can be found on banking and

12  investment account statements, credit card account statements, canceled checks, money orders,

13  deposit slips, check and savings books, business and personal ledgers, accounting records, safe

14  deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility

15  bills, overnight mail receipts, telephone bills, loan statements, records reflecting ownership of real or

16  personal property (such as deeds of trust or vehicle registration, insurance, and ownership

17  information), agreements, and canceled mail.  These records can be maintained on paper, but also can

18  be maintained as computer data on computers and mobile electronic devices, computer software,

19  computer disks.  The above items are typically kept by drug dealers on their person or in their

20  businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of

21  friends or relatives, and vehicles.

22     189.    Narcotics traffickers typically use mobile telephones, electronic devices, and other

23  communication systems, counter surveillance devices, and related devices in their drug trafficking

24  activities.  These items are stored by drug dealers on their person or in their businesses, residences or

25  cars, or the residences of friends or relatives.  These items are typically equipped with data storage

26  capability and contain phone numbers and/or electronically stored messages relating to drug

27  trafficking activity.  Information stored in electronic form on all of the above devices can provide

28  evidence of drug trafficking and the identity of associates.  For example, numbers stored in the

telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the narcotics trafficker is calling, and thus the identity of potential customers and suppliers. Pagers, cellular telephones, and other communication devices can contain similar information. Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators. Often, telephone answering machines retain recorded messages. The incoming messages can provide evidence of drug trafficking and the identity of associates while the outgoing message can provide evidence of who controls the telephone line.

190. Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized. Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds, and mortgage receipts.

191. Narcotics traffickers often memorialize their association and narcotics trafficking by taking, or posing for, photographs and/or videos of themselves, their associates, their property, assets, firearms, and tattoos. For example, narcotics traffickers often take photographs of themselves and their associates while in the process of narcotics sales, with narcotics trafficking proceeds, and in the areas where they traffic narcotics. They usually maintain these photographs and/or videos on their person or in their computers, businesses, residences or cars, or the residences of friends or relatives.

192. Narcotics traffickers often maintain firearms and ammunition on their person or in their homes, businesses, cars or residences, businesses or cars of associates or family members to protect themselves and their narcotics and assets purchased with narcotics trafficking proceeds. They also may maintain indicia of firearms and ammunition possession such as receipts for firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other documentation for firearms and ammunition.

193. As discussed above, narcotics traffickers often conceal evidence of drug dealing in vehicles outside their residences for ready access and to prevent detection and seizure by officers

1    executing search warrants at their residences.  This evidence, which is discussed in detail in the

2    preceding paragraphs, includes controlled substances, indicia such as packaging, documents and

3    electronic storage devices (and their contents) evidence tending to show the distribution of narcotics-

4    1 (such as IOU's, pay-owe sheets, ledgers, lists of names and phone numbers, telephone address

5    books, et cetera), digital pagers (and their contents), mobile telephones  and portable electronic

6    devices (and their contents), and counter-surveillance devices.

7    **VI.**     **CONCLUSION**

8          194.     For the reasons stated above, I believe that probable cause exists to search the

9    SUBJECT PREMISES for evidence, fruits, and instrumentalities of the TARGET OFFENSES.  I

10   therefore respectfully request that the Court issue the requested search warrants.  I also believe that

11   probable cause exists that the individuals named in paragraph 6 conspired to distribute, and possess

12   with intent to distribute, marijuana in violation of 21 U.S.C. § 846, and I respectfully request that this

13   Court issue the requested criminal complaint and arrest warrants.

14

15                                              Special Agent Richard P. Harvey
                                                Federal Bureau of Investigation
16

17   Subscribed to and sworn before me
     this 15th day of May, 2015.
18

19
     HONORABLE KANDIS A. WESTMORE
20   UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28